# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| HERMAN MILLER, INC., | Case No. 1:18-cv-05012-WMR |
| Plaintiff, | |
| v. | |
| BELNICK LLC, | |
| Defendant. | |

## HERMAN MILLER, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO PRECLUDE TESTIMONY FROM BELNICK REBUTTAL SURVEY EXPERT JAMES BERGER

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................1

II.     BACKGROUND ........................................................................2

        A.      Herman Miller's Eames Aluminum Group Chairs ............................2

        B.      Belnick's Accused Knock-Offs...............................................4

        C.      Dr. Englis' Surveys .........................................................4

III.    APPLICABLE LAW ...................................................................9

IV.     MR. BERGER'S TESTIMONY SHOULD BE PRECLUDED ..................10

        A.      Mr. Berger's Squirt-Versus-Eveready Criticisms Are Legally
                Erroneous And Should Be Precluded....................................10

        B.      Mr. Berger's Criticism Of The Relevant Consumers Is Wrong .........16

        C.      Mr. Berger's "If They Know Herman Miller They Won't Be
                Confused" Argument Should Be Precluded.......................................18

        D.      Mr. Berger's Testimony About Market Conditions Should Be
                Precluded As Both Irrelevant And Facially Inaccurate ....................20

        E.      Mr. Berger's Opinions About Why And Where Customers Buy
                Chairs Is Irrelevant And Unsupported .................................23

        F.      Mr. Berger's Secondary Meaning Commentary Should Be
                Precluded .............................................................24

        G.      Mr. Berger's Objection To The "Same Or Affiliated" Survey
                Questions Should Be Precluded .........................................25

        H.      Mr. Berger's Criticism Terminology Should Be Excluded ...............25

V.      CONCLUSION.........................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am., Inc. v. Skechers United States*,
No. 3:15-cv-01741-HZ, 2017 U.S. Dist. LEXIS 122459 (D. Or.
Aug. 3, 2017) ..................................................................................................13

*AmBrit, Inc. v. Kraft, Inc.*,
812 F.2d 1531 (11th Cir. 1986) .......................................................................13

*Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta,
LLC*,
685 F. Supp. 2d 1360 (N.D. Ga. 2010)............................................................16

*Bailey v. Allgas, Inc.*,
148 F. Supp. 2d 1222 (N.D. Ala. 2000)...........................................................10

*Bell v. Starbucks U.S. Brands Corp.*,
389 F. Supp. 2d 766 (S.D. Tex. 2005)...............................................................8

*Cameron v. Peach Cty.*,
No. 5:02-CV-41-1CAR, 2004 WL 5520003 (M.D. Ga. June 28,
2004) ................................................................................................................10

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
158 F.3d 548 (11th Cir. 1998) ........................................................................10

*Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*,
382 F. Supp. 3d 429 (E.D. Va. 2019) (19%) .....................................................8

*Copy Cop v. Task Printing*,
908 F. Supp. 37 (D. Mass. 1995).......................................................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)...........................................................................................9

*Deutz Corp. v. City Light & Power, Inc.*,
    No. 1:05-CV-3113-GET, 2009 WL 2986415 (N.D. Ga. Mar. 21,
    2009) ............................................................................................................ 10

*Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*,
    369 F.3d 1197 (11th Cir. 2004) ................................................................... 5

*Gallo v. Proximo Spirits, Inc.*,
    No. CV-F-10-411 LJO JLT, 2012 U.S. Dist. LEXIS 10669 (E.D.
    Cal. Jan. 27, 2012) ..................................................................................... 25

*GMC v. Lanard Toys, Inc.*,
    468 F.3d 405 (6th Cir. 2006) ..................................................................... 13

*Jockey International, Inc. v. Burkard*,
    1975 WL 21128 (S.D. Cal. 1975) ................................................................ 8

*Lon Tai Shing Co. v. Koch*,
    1991 WL 170734 (S.D.N.Y. June 20, 1991) (18%) ..................................... 8

*Long v. Amada Mfg. Am., Inc.*,
    No. CIV.A. 1:02-CV-1235, 2004 WL 5492705 (N.D. Ga. Mar. 31,
    2004) ............................................................................................................ 10

*McClain v. Metabolife Int'l, Inc.*
    401 F.3d 1233 (11th Cir. 2005) ................................................................... 9

*Mutual of Omaha Ins. Co. v. Novak*,
    836 F.2d 397 (8th Cir. 1987) (10%) ............................................................ 8

*Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*,
    198 F. Supp. 2d 474 (S.D.N.Y. 2002) ....................................................... 17

*Native Am. Arts, Inc. v. Bud K World Wide, Inc.*,
    No. 7:10-CV-124 HL, 2012 WL 1833877 (M.D. Ga. May 18,
    2012) .............................................................................................................. 9

*Opticurrent, LLC v. Power Integrations, Inc.*,
    No. 17-CV-03597-WHO, 2018 WL 6727826 (N.D. Cal. Dec. 21,
    2018) ............................................................................................................ 10

*Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg.
Grp., LLC,*
No. 18-CV-81606, 2019 WL 7376782 (S.D. Fla. Sept. 26, 2019) .....................11

*Planetary Motion, Inc. v. Techsplosion, Inc.,*
261 F.3d 1188 (11th Cir. 2001) ...........................................................................19

*Sara Lee Corp. v. Kayser-Roth Corp.,*
81 F.3d 455 (4th Cir. 1996) ...................................................................................8

*Tone Bros. v. Sysco Corp.,*
28 F.3d 1192 (Fed. Cir. 1994) .............................................................................13

*Tovey v. Nike, Inc.,*
No. 1:12CV448, 2014 WL 3510636 (N.D. Ohio July 10, 2014) .......................10

*Valador, Inc. v. HTC Corp.,*
242 F. Supp. 3d 448 (E.D. Va. 2017) ..................................................................17

*Warner Bros. Entertainment v. Global Asylum, Inc.,*
2012 WL 6951315 (C.D. Cal. Dec. 10, 2012) .......................................................8

*Water Pik, Inc. v. Med-Systems, Inc.,*
Civil Action No. 10-cv-01221-PAB-CBS, 2012 U.S. Dist. LEXIS
81592 (D. Colo. June 13, 2012) ...........................................................................17

*Williamson Oil Co. v. Philip Morris USA,*
346 F.3d 1287 (11th Cir. 2003) ...........................................................................10

**Statutes**

15 U.S.C. § 1125(a)(1)(A) ...............................................................................19, 25

15 U.S.C. § 1127 ..................................................................................................13

**Other Authorities**

Fed. R. Evid. 702(b) .............................................................................................10

## I.    <u>INTRODUCTION</u>

Herman Miller hereby moves to preclude testimony from Belnick's rebuttal survey expert James Berger.  Mr. Berger was proffered by Belnick to rebut the testimony of Herman Miller's survey expert Dr. Basil Englis, who had conducted a consumer survey that concluded that a meaningful number of purchasers of office chairs less than $599 would believe that Belnick's accused infringing chairs are put out by or affiliated with Herman Miller based on visual appearance.

Mr. Berger's central rebuttal argument is based upon a legally erroneous premise, namely that visual confusion should have been assessed by testing the survey participants' ability to identify the brand name of the furniture (*i.e.*, "Herman Miller"). But this is contrary to law, and misapprehends the purpose of Dr. Englis' survey.  It is well-established that proving trade dress confusion does *not* require consumers to know brand names: the inquiry concerns only visual appearance.  Apropos, Dr. Englis was testing *visual confusion* – not brand recognition – and was doing so largely in response to Belnick's facially untenable assertion that its near-exact copies of Herman Miller chairs do not cause confusion because their armrests have two sides instead of four.

Mr. Berger also improperly purports to opine on market conditions, yet (1) he lacks any qualifications as an expert in the furniture market, (2) his "facts" are wrong, and (3) his arguments are also irrelevant and nonresponsive to Dr. Englis' survey.

Indeed, they venture beyond any claimed expertise into unjustified advocacy.

## II.    <u>BACKGROUND</u>

### A.    <u>Herman Miller's Eames Aluminum Group Chairs</u>

Herman Miller's verified response to Belnick's Interrogatory No. 6 summarizes

how Eames Aluminum Group chairs are sold in the marketplace, and the bases for

Herman Miller's concerns about consumer confusion:

> Putting aside visual similarities of the chairs (which Herman Miller understands not to be the focus of this Interrogatory), the other bases for Herman Miller's infringement allegations are as follows.  First, there is at least a partial overlap in retail sales channels given that Herman Miller sells directly to retail consumers online,[1] and Belnick does the same through at least its BizChair.com website.  It is not necessary for Belnick to invoke the Herman Miller or Eames name to create confusion because trade dress law only requires that consumers might think products came from the same source, even if they do not know its name.  Retail consumers searching online (including on search engines such as Google) may encounter Belnick's accused products and assume they are somehow affiliated with or originate from Herman Miller…

> Belnick also sells furniture into commercial channels that compete with Herman Miller.  One sales scenario that is particularly concerning to Herman Miller is where office designers source cheaper imitation products for end users who originally specified Herman Miller.  This "product substitution" effect is a significant issue where small or large businesses, hotel chains, government institutions, or schools seek to decorate their facilities, and the

---

[1] Herman Miller's online store is at Store.HermanMiller.com.  Herman Miller also sells at retail through a limited number of partners like Herman Miller's wholly-owned Design Within Reach, which also sells online at DWR.com.

designers that they hire end up cutting corners to increase their own profits.  Unfortunately, the customers who wanted Herman Miller products may never appreciate that that is not what they received, particularly since they usually never see the shipping boxes, and only see fully assembled chairs placed on site by the delivery teams.

…Commercial end users might also buy Belnick's accused products at retail, being susceptible to the same kind of confusion as any other retail customer as discussed above.  Or, the agents and designers assisting commercial end users might source from retail (particularly for smaller jobs), and the end users receiving substituted products may not appreciate that they got a knock-off instead of an original.  These smaller size purchases are particularly common for Eames Aluminum Group because it is so commonly used as a conference room chair, where end users may order in the range of approximately 6-20 of them for a given conference room. Indeed, the most common order size that Herman Miller receives is for approximately 12 chairs.  Belnick itself receives many of these small size orders…placing Belnick in direct competition with a key group of target end users.

…With respect to the price differential between the original and accused chairs, most end users are likely unaware of the price of an original Eames Aluminum Group chair, and know it principally by its distinctive appearance.  Also, many of the kinds of end users interested in buying these chairs – particularly commercial end users – can otherwise readily afford to buy the Herman Miller originals, particularly at dealer channel pricing which is much less than retail.  Because such customers are very interested in having that special "look" of the Eames Aluminum Group chair, they are willing to pay a premium for it.

Herman Miller is concerned with confusion occurring at all stages of the initial sales process and thereafter.  First, initial interest confusion may happen where a consumer is initially drawn to an accused product believing it to be the original, even if they ultimately realize it is not.  There is a significant risk of this occurring online in particular…  Second, some consumers may

3

remain confused at the point of sale itself.  Finally, potential consumers who use the chairs post-sale may believe they are originals and be disappointed in their quality, or seek to buy one for themselves from the wrong source.

(*See* Ex.[2] 1; *see also* accompanying Williams Expert Report at ¶¶ 14-24 and 26-39.

Pricing of Eames Aluminum Group chair varies with which options are selected by the purchaser, but in general, retail channel prices are in the range of $1,300-$3,700 per chair, while commercial channel pricing is significantly lower (in some instances as low as $650 per chair).  (*See* accompanying Declaration of Casey Bond, ¶¶ 6-7.)

### B.   **Belnick's Accused Knock-Offs**

Belnick has a commercial sales channel under the brand "Flash Furniture" (www.flashfurniture.com) and an online retail platform principally operated through the BizChair.com website, as well as companion websites.  Pricing for accused infringing chairs at retail is shown as $257-$557, but marked down to $150-$230.  *See* BizChair.com, *e.g.*, Models BT-9826H and BT-9826M.  Belnick also otherwise generally sells most of its other leather-style office chairs for less than $599.  *Id., e.g.*, Models GO-2132-LEA-GG, GO-1850-1-LEA-GG, and 801L-LF0005-BK-LEA-GG.

### C.   **Dr. Englis' Surveys**

The principal goal of Dr. Englis' survey was simply to test whether relevant

---

[2] "Ex." refers to exhibits to the accompanying Declaration of Jean-Paul Ciardullo.

consumers are likely to find Belnick's knock-offs visually confusing with Herman Miller's Eames Aluminum Group chairs, notwithstanding slight differences in appearance on which Belnick has focused in its defense.  Dr. Englis' survey was *not* intended to prove legal infringement, as that analysis requires the fact-finder to balance other evidence (which will ultimately be supplied by other witnesses) concerning a variety of factors that include the strength of trademark, the degree of overlap in marketing channels, and Belnick's motives in copying.  *See Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197, 1207 (11th Cir. 2004).  Indeed, Mr. Berger misapprehends that Dr. Englis was trying to prove legal infringement.

Dr. Englis conducted two consumer surveys (not one, as Mr. Berger evidently believed)[3] in which participants were invited to progress through a series of screens online, indicating responses to questions as they went by clicking on radio button choices among a series of options.  (This is a standard method of running internet-based surveys that Mr. Berger does not dispute, and that he himself has used countless times.)  One survey concerned the Eames Aluminum Group Management "Thin Pad" chair, while the second concerned the "Soft Pad" variety.  Images of the chairs used in Dr. Englis' survey

---

[3] *See* Ex. 2, Berger Report, ¶ 5, purporting to fault Dr. Englis for testing only "one chair."  This and other clues suggest that Mr. Berger did not pay particularly close attention to Dr. Englis' report.  For example, Mr. Berger claims that Dr. Englis' price filter was $699, when in fact it was $599.  *Id.*, ¶ 14.

are shown in **Appendix A** (attached to this memorandum).  Separately, **Appendix B** (also attached to this memorandum) shows images of Belnick's corresponding accused infringing versions of the Eames Aluminum Group Management Thin Pad and Soft Pad chairs that Dr. Englis used in his survey.

For the Court's reference, the full "logic tree" of Dr. Englis' survey questionnaire is supplied in **Exhibit D to Dr. Englis' Report** (Dr. Englis' Report and the exhibits accompany this filing.)  Images of the actual screens that participants saw on their computers are included in **Exhibit E to Dr. Englis' Report**, *id.*, though note that the exhibit does not capture the fact that many of the images in fact appeared all together on the same screen in scrolling fashion.  Mr. Berger oddly criticizes Dr. Englis for using "an astounding 142 pages of screenshots," when of course no one given survey participant would have seen all of the different logic pathways, and many of the screens scrolled.

Putting all else aside, the similarity of Belnick's knock-offs to the Eames originals is striking.  Belnick's principal non-infringement argument has been that its chairs have only a two-sided armrest, whereas Herman Miller's originals have a four-sided armrest. One of the purposes of Dr. Englis' survey was to test whether relevant consumers would nonetheless believe Belnick's chairs to be the same or affiliated with the originals based on their visual appearance.

As is pertinent here, the surveys filtered out respondents unless they indicated that

they recently purchased or expected to purchase an office chair for less than $599.[4]  This price ceiling was chosen so as to particularly focus on consumers who might buy Belnick's products, which are advertised online at prices below $599.  (*See* Section II.B.)  As discussed in Section III, it is standard procedure to focus on the target market for potential purchasers of the *accused* products.

These filtered respondents were then shown images of the Herman Miller chair, with various angles displayed as they would typically be, for example, when a customer is shopping online (which is exactly where the Belnick chairs are sold).  (Englis Report Ex. E, pp. 15, 18.)  Only the chair was shown, and no identifying information was given about its brand name, or indicating that Herman Miller is the manufacturer.  Examples of these images are shown in **Appendix A**.  The respondents were then later shown a different screen in which an array of several different office chairs was shown, each one including several different angles as they might see online.  (Englis Report Ex. E, pp. 19-43.)  One of the chairs was Belnick's accused chair.[5]

---

[4] *See* Englis Report Ex. E at p. 9, Ex. D at pp. 4-5 – only participants who selected office chairs below $599 advanced.

[5] A parallel survey tested a "control chair," which was one that had the same basic structure as the Eames Aluminum Group Management chairs, but with the most salient trade dress features altered.  For example, instead of parallelogram armrests, the armrests on the control chair were supported by a single strut.  Mr. Berger took no issue with Dr. Englis' control chairs.

For each of the chairs in the array, respondents were asked if they thought it was put out by the same company that makes the previous chair they had seen (the unnamed Herman Miller original).  (*Id.*)  Respondents were then later also separately asked if they thought that any of the chairs in the array were "affiliated or connected with the brand or company that makes or puts out [the unnamed Herman Miller original they had seen]." (Englis Report Ex. E, pp. 44-102.)

Dr. Englis' survey showed that 76.4% of respondents believed the Belnick Thin Pad knock-off was made by or affiliated with Herman Miller, and 68.9% of respondents believed the Belnick Soft Pad knock-off was made by or affiliated with Herman Miller. Subtracting out the results from the control groups, net confusion rates of 26% and 19.3% respectively were seen.  (Englis Report at ¶¶ 65 and 68.)  These net confusion levels are considered actionable under the law.[6]  Nor does Mr. Berger contest that such levels of net confusion are actionable in his rebuttal report, and he has otherwise previously

---

[6] *See*, *e.g.*, *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 (4th Cir. 1996) (actionable at 15%-20%); *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400 (8th Cir. 1987) (10%); *Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 465 (E.D. Va. 2019) (19%); *Warner Bros. Entertainment v. Global Asylum, Inc.*, 2012 WL 6951315, at *9-10 (C.D. Cal. Dec. 10, 2012) (16%-24%); *Bell v. Starbucks U.S. Brands Corp.*, 389 F. Supp. 2d 766, 772 (S.D. Tex. 2005) (25% "significant"); *Copy Cop v. Task Printing*, 908 F. Supp. 37, 42 (D. Mass. 1995) (16.5%); *Lon Tai Shing Co. v. Koch*, 1991 WL 170734, at *22 (S.D.N.Y. June 20, 1991) (18%); *Jockey International, Inc. v. Burkard*, 1975 WL 21128, at *6 (S.D. Cal. 1975) (11.4%).

testified that they are. *Native Am. Arts, Inc. v. Bud K World Wide, Inc.*, No. 7:10-CV-124 HL, 2012 WL 1833877, at *2 (M.D. Ga. May 18, 2012) (Berger cited 20% net confusion as actionable).

The results of Dr. Englis' survey demonstrate that a statistically significant sampling of consumers believe that one product is the same as, or affiliated with, another based upon its appearance, without necessarily knowing any of the relevant brand names.

## III.   <u>APPLICABLE LAW</u>

As explained by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993), to determine the admissibility of expert testimony, a trial court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

The burden of establishing qualification, reliability and helpfulness lies with the party offering the expert opinion. *See McClain v. Metabolife Int'l, Inc.* 401 F.3d 1233, 1238 (11th Cir. 2005).

If an expert fails to explain the bases for his or her conclusions – or lacks any basis

in experience or evidence – that testimony is excludable.[7]

It is likewise axiomatic that a purported expert opinion that is contrary to applicable law is also *per se* excludable.[8]

## IV.   MR. BERGER'S TESTIMONY SHOULD BE PRECLUDED

### A.   Mr. Berger's Squirt-Versus-Eveready Criticisms Are Legally

---

[7] Fed. R. Evid. 702(b) (facts or data required); *Deutz Corp. v. City Light & Power, Inc.*, No. 1:05-CV-3113-GET, 2009 WL 2986415, at *6 (N.D. Ga. Mar. 31, 2009) (Court excluding testimony of expert who did not "cite to any professional journals, learned treatises, or scientific literature that he utilized in formulating his opinions."); *see also*, *Tovey v. Nike, Inc.*, No. 1:12CV448, 2014 WL 3510636, at *9 (N.D. Ohio July 10, 2014) ("Absent reliable support for her conclusion, [the expert's] opinion amounts to only speculation, which is generally inadmissible.  No matter how good experts' credentials may be, they are not permitted to speculate.") (internal quotations, alterations, and citations omitted); *Cameron v. Peach Cty.*, No. 5:02-CV-41-1CAR, 2004 WL 5520003, at *9-11 (M.D. Ga. June 28, 2004) (excluding the opinions of experts who did not provide reliable bases for their opinions).

[8] *See, e.g.*, *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1322-23 (11th Cir. 2003) (excluding the testimony of expert who was opining on collusion and where expert's definition of "collusion" stood contrary to the law); *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 567 n.27 (11th Cir. 1998) (noting that expert's "erroneous" opinions "regarding the legal standards applicable to the case" should be excluded); *Opticurrent, LLC v. Power Integrations, Inc.*, No. 17-CV-03597-WHO, 2018 WL 6727826, at *16 (N.D. Cal. Dec. 21, 2018) (striking portions of expert report that were based on noninfringement arguments foreclosed by the law); *Long v. Amada Mfg. Am., Inc.*, No. CIV.A. 1:02-CV-1235, 2004 WL 5492705, at *13 (N.D. Ga. Mar. 31, 2004) ("Thus, to the extent that Plaintiffs' experts seek to testify that OSHA regulations are applicable to manufacturers, distributors, and service companies such as those involved in this case, the Court holds that such opinions would not be reliable inasmuch as they conflict with controlling law."); *Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1244-45 (N.D. Ala. 2000) (excluding testimony of expert whose market analysis ran "contrary to well-established law").

### Erroneous And Should Be Precluded

Mr. Berger's primary criticism of Dr. Englis' survey is that it used a "Squirt" format rather than an "Eveready" format (named for the cases in which the formats were first recognized).  In a Squirt style trademark survey, the participant is first shown the plaintiff's product or brand name, and then later separately shown an array of other products or names that includes the accused infringing one, and asked if they think anything from the array is associated with the first image or word that they saw.  *See Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, No. 18-CV-81606, 2019 WL 7376782, at *3 (S.D. Fla. Sept. 26, 2019) (*citing* 6 McCarthy on Trademarks and Unfair Competition § 32:173.50 (5th ed. 2019)).  By contrast, in an Eveready style survey, the plaintiff's product or brand name is not shown to the participants, and they are instead only shown the defendant's accused infringing product or brand name, and then tested to see if they identify plaintiff's brand name in response. (*Id.*)

Mr. Berger explained how his proposed Eveready study would be implemented in his report at Page 13 (Ex. 2):

> All Dr. Englis had to do was show the alleged infringing chair and ask the respondent: "Who do you believe puts out this chair?"  If the respondent didn't know immediately, Englis could have given him or her a list of five companies and the respondent could choose one of them.  This would be an unaided/aided recall methodology.

11

In his deposition, Mr. Berger explained his opinion further:

> Q.   So to confirm, is your proposal of that the preferable or appropriate survey methodology would have been what is just described in this paragraph [at Page 13 of the Berger Report]?
>
> A.  Yeah. If there was a real infringement, that would be the – that would be the format.  A real infringement would be if somebody was coming into the market at the level that the Herman Miller product was in the market.   That, you would show them the infringing product and you would say, "Who makes this product?" And you would say, "I don't know."  Then you could say, "Well, here.  Here's a list of five companies.  Which one of these companies do you think makes the chair?"  Now, see, the unaided recall is that top of mind.   The aided recall would be the choices.   And the chances are that if that person had shopped or done any work, the Herman Miller name would come up.  So that's how you would get your – that's how the Eveready survey works.  That's exactly how it works.
>
> Q.  And in that scenario, if they were to identify the accused product as being Herman Miller.
>
> A.  Yeah.
>
> Q.  That would count as a confused participant result; is that right?
>
> A.  Yes, sir.  Yes, sir.
>
> Q.  And if they were – if the participant were unable to identify the name of the product by Herman Miller, that would mean a non-confused participant result; is that right?
>
> A.  That's right.

(Ex. 3, Berger Transcript, 55:9-56:14.)

The foregoing opinions of Mr. Berger are **legally erroneous** and should be excluded.  The present case is about trade dress only, *i.e.*, visual appearance alone – not

brand name recognition.  It is black letter law that actionable trade dress confusion exists even if the consumers do not know the name of the product brand or the name of the manufacturer.   15 U.S.C. § 1127 ("The term 'trademark' includes any word, name, symbol, or device, or any combination thereof … to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1536 n.14 (11th Cir. 1986) ("Secondary meaning is the connection in the consumer's mind between the mark and the product's producer, whether that producer is known or unknown"); *adidas Am., Inc. v. Skechers United States*, No. 3:15-cv-01741-HZ, 2017 U.S. Dist. LEXIS 122459, at *24-25 (D. Or. Aug. 3, 2017) ("A showing of secondary meaning only requires proof that the public associates the trade dress with a single source, even if that source is anonymous.") (shoe trade dress) (citations omitted); *Tone Bros. v. Sysco Corp.*, 28 F.3d 1192, 1203 n.11 (Fed. Cir. 1994) ("The anonymous source rule states that a consumer need not know the identity of the single source, and that all that is necessary to establish secondary meaning is that the consumer associate the trade dress with a single, albeit anonymous, source.  …In other words, all that is necessary is that the consumer believe that the trade dress denotes a single thing coming from a single source."); *GMC v. Lanard Toys, Inc.*, 468 F.3d 405, 418 (6th Cir. 2006) ("knowledge that a product comes from a single source, even without naming that

source, is sufficient to establish secondary meaning").

Thus, Mr. Berger's arguments concerning the survey format are fatally flawed.

In this case, Herman Miller has not made any allegations that Belnick has used the trademarked names HERMAN MILLER® or EAMES®, nor has Herman Miller alleged as part of its legal claims that consumers know those names. Rather, Herman Miller alleges only (and need allege only) that its asserted trade dress product configurations are visually distinctive and recognizable to relevant consumers as being a particular distinctive design, even though they may not know what it is called, or who makes it. Dr. Englis' survey was not designed to test brand recognition: it was designed to test visual confusion in response to Belnick's assertions that its accused chairs are visually distinct from Herman Miller's.

Although Mr. Berger's proposed Eveready study would indeed capture confusion among participants who happen to already be familiar with the Herman Miller (or Eames) brand *by name* and who incorrectly identify Belnick's chairs as being made by "Herman Miller," <u>Mr. Berger's proposed Eveready study would completely miss the large swath of participants who in fact recognize the trade dress visually and believe it is derived from a single source, but who are unfamiliar with its brand name or the name "Herman Miller." Indeed, that may very well be the majority of the confused population.</u>

The court in *Sunbeam Corp. v. Equity Indus. Corp.*, 635 F. Supp. 625, 631 (E.D.

14

Va. 1986) sustained this same criticism of an Eveready style survey in a trade dress case. In that case, the plaintiff claimed trade dress rights in the appearance of a food processor called an OSKAR, and the defendant's Everready survey asked respondents to name the manufacturer.  The Court rejected the survey, explaining:

> By failing to focus respondents on the appearance or design configuration of the displayed OSKAR, which is all that plaintiff is claiming has acquired secondary meaning, the survey missed the boat. Also, by asking for the names of companies that produced the displayed product, the survey overlooked those individuals who may have linked the product's overall appearance with a single but anonymous source.[9]

Ultimately, Eveready studies are ideal for testing confusion with respect to well-known *brand names*: for example, if a survey participant were shown an accused infringing brand name called "Koka Cola" and asked if they could name what company they thought it was affiliated with.[10]  But Mr. Berger's proposed Eveready format is illogical – and indeed is legally erroneous – for testing whether consumers are confused

---

[9] The surveys in *Sunbeam* were explicitly intended to test secondary meaning, and for that reason are further inapplicable to Dr. Englis' visual confusion survey.

[10] *See* Swann, Eveready and Squirt—Cognitively Updated, 106 Trademark Rptr 727, 733-734 (2016) ("'Top-of-mind' refers to marks that are readily accessible in memory…. The Eveready format is thus the gold standard for assessing confusion as to (readily recalled) top-of-mind marks; but not all commercially strong marks are cognitively stored top-of-mind; and the Eveready format is thus not appropriate for all strong marks…. [W]hen marks exist proximately in the market, Eveready may not, by itself, be appropriate to test for likelihood of confusion as to strong marks that are generally recognized, but not readily recalled.").

by pure visual similarities between a plaintiff's product configuration design and a defendant's accused design. In that context, *brand name* recognition is not what is being tested, and the best methodology is exactly what Dr. Englis employed: a visual comparison test under the Squirt model.

### B. Mr. Berger's Criticism Of The Relevant Consumers Is Wrong

Mr. Berger has opined that Dr. Englis erred in targeting consumers who buy chairs for less than $699, arguing that Dr. Englis should instead have limited his survey to the "high end" market of people who buy chairs for $1,000-$3,000. (Ex. 2, Berger Report at ¶ 5, "Failure to Address Price"; and ¶ 16.) This is legally erroneous.

The present case concerns what is called "forward confusion," which is when consumers buying an infringer's product will be misled into believing that the infringer's product actually comes from or is affiliated with the brand owner.[11] It is well established that when assessing forward confusion, the most relevant consumers are those in the *infringer's* market. *Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC*, 685 F. Supp. 2d 1360, 1373 (N.D. Ga. 2010) ("the appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged

---

[11] This is in contrast to a "reverse confusion" case in which the infringer so overwhelms the market that consumers incorrectly believe that the brand owner's products are sourced from or affiliated with the infringer.

16

infringer's goods or services.  []  In a traditional case claiming forward confusion 'the proper universe to survey is the potential buyers of the *junior* user's goods or services.'") (citing 6 McCarthy on Trademarks, § 32:159) (emphasis in original); *Water Pik, Inc. v. Med-Systems, Inc.*, Civil Action No. 10-cv-01221-PAB-CBS, 2012 U.S. Dist. LEXIS 81592, at *11 (D. Colo. June 13, 2012) ("In cases of forward confusion, 'the proper universe to survey is the potential buyers of the *junior* user's goods or services.'") (also citing McCarthy); *Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002) ("The proper universe in a forward confusion case is the universe of potential purchasers of the junior user's product").

Put another way, it would be legal error in a forward confusion case to exclude the infringer's likely customers from a survey because that is the very population which stands to be confused.  *See Valador, Inc. v. HTC Corp*., 242 F. Supp. 3d 448, 460 (E.D. Va. 2017) (explaining that surveying the wrong party's consumer base was "akin to the government's counting heads in China for the U.S. Census.").  Mr. Berger appears completely unaware of this basic legal precept (or at least erroneously fails to acknowledge it), and his rebuttal of Dr. Englis' target consumers should be stricken.[12]

---

[12] Herman Miller does not say that consumers who can *afford* chairs over $599 are not relevant, and to the contrary believes they can be confused as well and buy from Belnick instead of Herman Miller.  The point is that persons who have *in fact*

**C.**     **Mr. Berger's "If They Know Herman Miller They Won't Be Confused" Argument Should Be Precluded**

Much of Mr. Berger's rebuttal is based upon the following circular logic: if someone is familiar with Herman Miller and knows what a Herman Miller chair costs, they will not be confused by Belnick's lower cost chairs.  For example, in his deposition, Mr. Berger testified that (Ex. 3, Berger Tr. 40:6-17):

> Let's say a company like Chevy or Nissan or Toyota or somebody put out a car that looks like a $60,000, $70,000 Mercedes-Benz product, okay.  Do you think that somebody who is going to buy that Mercedes-Benz would even look at the Chevy or the Toyota? Because they want to buy the Mercedes-Benz, they don't want to buy a Chevy.  Even though they have the same look, they won't buy it because of the fact that it's priced differently and they know what they're getting and they know what they're looking for, as opposed to the other company.

As a threshold matter, even sophisticated consumers may believe that Belnick is selling some kind of related lower cost brand that is affiliated with or under license from Herman Miller, the way that the Ford Motor Company sold the Mercury brand of cars, many of which were essentially the same as Ford-brand models only at different price points (*e.g.*, Ford Explorer and Mercury Mountaineer[13]).  That would be actionable

---

*recently purchased* chairs below $599 is the most appropriate population to survey given that they are properly deemed within Belnick's customer pool.

[13] https://en.wikipedia.org/wiki/Mercury_Mountaineer.

trademark confusion.[14]  15 U.S.C. § 1125(a)(1)(A) (making actionable any confusion as to affiliation or sponsorship); *Planetary Motion, Inc. v. Techsplosion, Inc*., 261 F.3d 1188, 1201 (11th Cir. 2001) ("[A] trademark owner has protection against use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner.") (internal quotations and citation omitted).

But even if connoisseurs were not confused, that is obviously not the target market that Herman Miller is concerned about.  Indeed, Mr. Berger's argument that "people who would not be confused will not be confused" is unhelpful and circular.  As articulated in Section II.A, Herman Miller's position in this case is that confusion is likely among all kinds of end consumers: everyone from the person making buying decisions for a large company, to an individual appointing a home office.  While these people may recognize the Eames Aluminum Group chairs as being a distinct brand based on their appearance, they need not have any idea what is the brand name, or that the name of the manufacturer is Herman Miller, or what the original chairs usually cost.  And even if they have some vague idea that the chairs are expensive, they might believe that Belnick is lawfully

---

[14] Mr. Berger's premise also ignores post sale confusion, wherein someone sees a Belnick chair in use after it has already been purchased (and thus does not know what it cost), and mistakenly believes it is a Herman Miller.

selling them at a discount.  Indeed, Belnick constantly advertises on its websites that its prices are steeply discounted, suggesting that but for some kind of limited-time sale, they otherwise would be priced similarly to Herman Miller originals.[15]

The bottom line is that all kinds of end users might be confused by Belnick's knockoffs for a whole host of different reasons, and Mr. Berger offers no valid reason why any given likely purchaser of *Belnick's chairs* should have been excluded from Dr. Englis' survey.  Because Mr. Berger's argument about connoisseurs completely fails to acknowledge how actual confusion can happen in the marketplace, and because Mr. Berger is entirely unqualified to be opining on the furniture marketplace (as discussed further below), his arguments on this issue must be rejected.

### D.    Mr. Berger's Testimony About Market Conditions Should Be Precluded As Both Irrelevant And Facially Inaccurate

Mr. Berger's report and testimony is littered with conclusory and incorrect assertions about the relevant marketplace, all of which should be excluded because they are incorrect, and Mr. Berger is not qualified to opine on them.  For example, Mr. Berger asserts that:

> "Designs similar to the Herman Miller Eames Aluminum Group and Eames Soft Pad chairs are offered for sale from many different

---

[15] *See* BizChair.com generally, showing high prices slashed through next to lower ones.  To the extent that Belnick is advertising a "neverending sale," that practice may independently be unlawful.

> sources and suppliers." (Berger Report, p. 2.)

> "On the other hand, high-end chairs that cost between $1,000 and $3,000 are most likely purchased in a furniture store with a show room. Purchasing on-site enables the buyer of a high-priced chair to sit in the chair for a 'test drive.'" (Berger Report, p. 15.)

Mr. Berger is completely unqualified to opine on the furniture market. In the "Documents Reviewed" section of his Report, he indicates that he reviewed a handful of articles on Wikipedia, and ran some Google searches. At his deposition, Mr. Berger confirmed that he is not an expert in the furniture market, and that his sources of information were essentially random internet searches performed over a few hours. *See, e.g.*, Ex. 3, Berger Tr. at 10:15-11:5 (uses the internet to research an unfamiliar industry); 23:9-12 ("Q: [W]ould you agree that you wouldn't characterize yourself as an expert in the marketing and sale of chairs? A: Yes, I would say that."); and 33:9-16 (assumptions were made based on internet searches, including information found on Wikipedia).

Not only is Mr. Berger unqualified to discuss market conditions, but his assertions are simply wrong and irrelevant. Mr. Berger's claim that "[d]esigns similar to the Herman Miller Eames Aluminum Group and Eames Soft Pad chairs are offered for sale from many different sources and suppliers" is not relevant to any issue raised by Dr. Englis, and is instead a gratuitous attempt to attack secondary meaning, which Dr. Englis was not trying to measure. Hence, the testimony is not proper rebuttal. The assertion is also unsupportable. Mr. Berger uses his own unilateral and undefined standard to assess

21

"similarity," and bases his comments on random Google searches.  Indeed, Herman Miller is concurrently moving in limine to exclude Belnick's "evidence" of purported third party infringers (which consists only of some websites) on the grounds that it is insufficient to prove any point in dispute, and unreliable.  Mr. Berger's opinions about third party sellers are likewise unreliable and irrelevant, and should be precluded.  His willingness to volunteer such baseless opinions outside the narrow scope of even his claimed expertise also shows plain bias.

Mr. Berger is also incorrect in asserting that people who buy "high end" chairs get them from "showrooms" where they "test drive" them.  In reality, most Eames Aluminum Group end users acquire Herman Miller chairs online, or through intermediaries like interior designers, and already know they want the chairs because of their iconic status, and/or from having already sat in them before.  (*See* accompanying Declaration of Casey Bond, ¶¶ 5, 6.)   Mr. Berger's testimony about "test drive showrooms" is his own factually unsupported supposition, and should be excluded. Indeed, it is more likely that consumers will have seen images of Herman Miller's chairs online (just like Belnick's chairs), or in real world offices (devoid of pricing or a comparison shopping context), than in sales showrooms.  (*Id.*)  Herman Miller need not go to extensive lengths to prove up this reality: the point is that Mr. Berger has no qualifications to opine on the matter, so his marketplace conditions testimony should be

stricken.  Such testimony simply confirms bias.

### E.   Mr. Berger's Opinions About Why And Where Customers Buy Chairs Is Irrelevant And Unsupported

In purely conclusory fashion, Mr. Berger faults Dr. Englis for not taking into consideration "why" and "where" chair purchases are made.  However, Mr. Berger fails to propose how such factors could have been taken into consideration, or why they are of any relevance to Dr. Englis' conclusions about visual similarity.

Mr. Berger opines that "[b]ased on the screener criteria, one would imagine the respondent purchased in the recent past or planned to purchase in the future a chair for a home office."  (Ex. 2, Berger Report, p. 4.)  But there in fact is absolutely nothing in the Englis survey that limited respondents to only purchasers of home office chairs, so Mr. Berger's critique is facially incorrect.  As discussed in Section II.A, relevant consumers might include everyone from the person selecting furniture for a hotel or corporate office, to an individual buying a chair for a home office.  Dr. Englis' survey quite properly did not exclude any of these relevant consumers.  In any event, Mr. Berger is entirely unqualified to opine on who relevant consumers are or are not, as discussed *supra*, and so cannot be heard to "rebut" Dr. Englis on the matter.

With respect to "where" chairs are purchased, as was discussed in Section II.A, and in the accompanying Declaration of Casey Bond, consumers are more likely to see Herman Miller's chairs as images on an electronic screen than they are to see them in Mr.

Berger's "test drive showrooms."   Mr. Berger wonders about a situation where consumers would go to a brick-and-mortar store and be able to compare Belnick and Herman Miller chairs in person.  (*See id*., Berger Report, p. 4: "If it is purchased at a store where office chairs and furniture are sold, the buyer can sit in a variety of chairs and easily compare prices.")  But, to Herman Miller's knowledge, no such place exists where Herman Miller and Belnick chairs would be sold in the same physical store.  (Bond Declaration, ¶ 8.)  These chairs are largely sold online, or through separate commercial market channels.  (*Id*.)  But again, Herman Miller need not respond to Mr. Berger's report with a detailed exposition of the actual marketplace: the point is that Mr. Berger has no basis or qualifications of his own to opine about that marketplace, and so should not be permitted to.

### F.   Mr. Berger's Secondary Meaning Commentary Should Be Precluded

At various points in his report and in his testimony, Mr. Berger misapprehends the purpose of the Englis survey, and forays into a discussion of secondary meaning, *i.e.*, the popularity of the Eames Aluminum Group chairs.  (*See, e.g.,* Berger Report, p. 13: "If the Plaintiff's chairs are as famous as the Complaint says they are, they would have easily passed the EVEREADY test.").  But Dr. Englis was not testing secondary meaning and such testimony thus is not proper rebuttal.  Rather, Dr. Englis was assessing confusion based on visual similarity.  Thus, all of Mr. Berger's discussion of secondary meaning

24

and popularity is irrelevant, is not rebuttal, is prejudicial, and should be precluded.

### G.   Mr. Berger's Objection To The "Same Or Affiliated" Survey Questions Should Be Precluded

Mr. Berger criticizes Dr. Englis for asking survey respondents if they thought any of the chairs in the test array were put out by the same source as the original (unnamed Herman Miller) chair, and then asking if they thought if any of the chair makers were affiliated with that source even if not the same.  (Ex. 2, Berger Report, pp. 4-5.)  This criticism is legally erroneous.  The very definition of trademark confusion is that a consumer has a false belief that the infringer either is (1) the same as the mark holder, or (2) affiliated with them.  15 U.S.C. § 1125(a)(1)(A).

### H.   Mr. Berger's Criticism Terminology Should Be Excluded

Mr. Berger oddly takes issue with the fact that Dr. Englis' survey questions used the phrases "made or put out by" and "brand or company" in reference to a manufacturer. (Ex. 2, Berger Report, p. 16.)  First of all, Mr. Berger fails to articulate how such phrasing compromises the survey at all.  But more than that, this language is standard in trademark surveys.  *See, e.g., Gallo v. Proximo Spirits, Inc.*, No. CV-F-10-411 LJO JLT, 2012 U.S. Dist. LEXIS 10669, at *48 (E.D. Cal. Jan. 27, 2012).

## V.   CONCLUSION

For the foregoing reasons, Herman Miller respectfully requests that Mr. Berger be precluded from testifying.

Dated:  March 2, 2020                    Respectfully submitted,

                                         _s/ Jean-Paul Ciardullo_
                                         Jean-Paul Ciardullo (admitted _pro hac_)
                                         email:  jciardullo@foley.com
                                         **FOLEY & LARDNER LLP**
                                         555 South Flower Street, Suite 3500
                                         Los Angeles, CA 90071-2411
                                         Phone: 213.972.4500
                                         Facsimile: 213.486.0065

                                         Jonathan E. Moskin (admitted _pro hac_)
                                         email:  jmoskin@foley.com
                                         **FOLEY & LARDNER LLP**
                                         90 Park Avenue
                                         New York, NY 10016-1314
                                         Phone: 212.682.7474
                                         Facsimile: 212.687.2329

                                         Amanda G. Hyland
                                         email: ahyland@taylorenglish.com
                                         Georgia Bar No. 325115
                                         **TAYLOR ENGLISH DUMA LLP**
                                         1600 Parkwood Circle
                                         Suite 200
                                         Atlanta, GA 30339

                                         Attorneys for Plaintiff
                                         HERMAN MILLER, INC.

# APPENDIX A
# HERMAN MILLER PRODUCT IMAGE SCREENS FROM ENGLIS SURVEY

Progress

Please look at the product shown here as you would if you were shopping online or in a store for an office desk chair. This chair is also available in other color options. Take as much time as you would like.

Please click any of the images on the left to enlarge them. You can also click on the right image to enlarge it. Click "X" in the upper right corner to close the enlarged image.

The "Next" button will be hidden for a short time to ensure you have enough time to review the images. **When you are ready to continue, please click on the "Next" button shown below.**

**CHAIR #1**






NEXT▶

Progress

Please look at the product shown here as you would if you were shopping online or in a store for an office desk chair. This chair is also available in other color options. Take as much time as you would like.

Please click any of the images on the left to enlarge them. You can also click on the right image to enlarge it. Click "X" in the upper right corner to close the enlarged image.

The "Next" button will be hidden for a short time to ensure you have enough time to review the images. **When you are ready to continue, please click on the "Next" button shown below.**

CHAIR #1






NEXT▶

## **APPENDIX B**
## **IMAGES OF TEST SCREENS FROM ENGLIS SURVEY**
## **SHOWING ACCUSED INFINGING BELNICK CHAIRS**









