# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

HERMAN MILLER, INC.,

        Plaintiff,

   v.

BELNICK LLC,

        Defendant.

Case No. 1:18-cv-05012-WMR

## HERMAN MILLER, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY OF MATTHEW MALLOUK

# TABLE OF CONTENTS

I.      INTRODUCTION ...............................................................................1

II.     BACKGROUND ................................................................................4

        A.      Belnick's Limited Discovery Responses ...............................4

        B.      Belnick Offered No Affirmative Expert Witnesses And Was
                Limited To Rebuttal Only ....................................................5

        C.      Mr. Mallouk's Inadequate Knowledge And Limited Research ...........6

        D.      Mr. Mallouk Does Not Rebut Herman Miller's Experts ...................11

III.    ARGUMENT....................................................................................14

        A.      Mr. Mallouk Is Not Qualified To Opine On Consumer
                Shopping or Likelihood of Confusion................................15

        B.      Mr. Mallouk's Report Is Not Proper Rebuttal ...................17

        C.      Belnick May Not Use Mr. Mallouk To Introduce Purported
                Evidence That It Failed To Properly Produce In Discovery..............20

        D.      Mr. Mallouk's Testimony Is Irrelevant ...............................21

        E.      Mr. Mallouk Is Not Permitted To Testify to the Ultimate Issue.........25

        F.      Mr. Mallouk Is Biased.........................................................25

IV.     CONCLUSION...............................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC*, 685 F. Supp. 2d 1360 (N.D. Ga. 2010).......................................................17

*Bayer Healthcare Pharm., Inc. v. River's Edge Pharm., LLC*, No. 1:11-CV-1634-HLM, 2015 WL 11142427 (N.D. Ga. May 21, 2015) ..............................................................................................................21

*Capital Sec. Sys., Inc. v. NCR Corp.*, No. 1:14-CV-1516-WSD, 2017 WL 2363749 (N.D. Ga. May 31, 2017) ..............................................................................................................18

*City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548 (11th Cir. 1998) ..................................................................15

*Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277, 2016 WL 3102225 (S.D. Fla. June 2, 2016)........................20

*Coward v. Forestar Realty, Inc.*, 282 F. Supp. 3d 1317 (N.D. Ga. 2017)...........................................................18

*Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311 (9th Cir. 1995) ...................................................................21, 22

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)....................................................................14, 21, 22

*Gaddy v. Terex Corp.*, No. 1:14-CV-1928-WSD, 2017 WL 3276684 (N.D. Ga. Aug. 2, 2017) ..............................................................................................................18

*Greater Hall Temple Church of God v. S. Mut. Church Ins. Co.*, No. 2:17-CV-111, 2019 WL 4147589 (S.D. Ga. Aug. 30, 2019) ......................15

*Inc. v. Shah*,
  No. SACV1301321DMGJEMX, 2014 WL 12603075 (C.D. Cal.
  Dec. 2, 2014) ........................................................................................21

*McClain v. Metabolife Int'l, Inc.*
  401 F.3d 1233 (11th Cir. 2005) ..........................................................14

*Montgomery v. Aetna Cas. & Sur. Co.*,
  898 F.2d 1537 (11th Cir. 1990) ..........................................................25

*Omar v. Babcock*,
  177 F. App'x 59 (11th Cir. 2006) ........................................................25

*Phelan Holdings, Inc. v. Rare Hosp. Mgmt., Inc.*,
  No. 8:15-CV-2294-T-30TBM, 2017 WL 1135266 (M.D. Fla. Mar.
  27, 2017) ..............................................................................................17

*Planetary Motion, Inc. v. Techsplosion, Inc.*,
  261 F.3d 1188 (11th Cir. 2001) ..........................................................23

*Savage v. Conrad*,
  No. 1:14-CV-4103-ODE, 2016 WL 11639660 (N.D. Ga. Nov. 21,
  2016) ....................................................................................................15

*United States v. Brown*,
  415 F.3d 1257 (11th Cir. 2005) ..........................................................15

*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) ..........................................................22

*Valador, Inc. v. HTC Corp.*,
  242 F. Supp. 3d 448 (E.D. Va. 2017) ..................................................15

*Wright v. Case Corp.*,
  No. 03–cv–1618–JEC, 2006 WL 278384 (N.D. Ga. Feb. 1, 2006) ...................15

**Statutes**

15 U.S.C. § 1125(a)(1)(A) ........................................................................23

**Other Authorities**

Fed. R. Civ. P. 26 ......................................................................................20

Fed. R. Civ. P. 37 ......................................................................................20

Fed. R. Evid. 402 ......................................................................................21

Fed. R. Evid. 403 ......................................................................................22

Fed. R. Evid. 702 ...........................................................................1, 14, 22

Local Rule 84 ...........................................................................................4, 5

I.    **INTRODUCTION**

Herman Miller, Inc. ("Herman Miller") hereby moves in limine, and pursuant to

F.R.E. 702, to exclude the rebuttal testimony of Matthew Mallouk, a former Belnick

executive who Belnick contends has some expertise in selling furniture online.  The four

principal grounds for this motion are that: (i) Mr. Mallouk's report is not proper rebuttal,

as he nowhere attempts to address or respond to any of the three reports he purports to

rebut; (ii) Mr. Mallouk lacks any qualifications as an expert and had indeed become a

senior officer of Belnick just at the time the Complaint in the action was filed; (iii) Mr.

Mallouk's report on its face is nothing more than an attempt to supplement the factual

record with information Belnick had been required to produce in discovery, yet failed to

timely produce, and (iv) Mr. Mallouk improperly and with no basis whatsoever purports

to opine on the ultimate issue (likelihood of confusion).  Moreover, on all of these issues,

the actual attachments to his report directly contradict his stated opinions.

The Mallouk Report purports to be offered in rebuttal to the consumer survey

report prepared by Dr. Basil Englis, the historical summary of the fame of the Eames

designs prepared by John Berry, and the analysis of product substitution in the furniture

industry prepared by Melinda Kane Williams.  Mr. Mallouk offers not a word of analysis

of any of the three reports he purports to rebut, but instead principally seeks to introduce

new evidence to support Belnick's affirmative defense that Herman Miller's rights in the

Eames Aluminum Group designs are weakened by third-party sales of cheap copies of the Eames Aluminum Group chairs similar to Belnick's, yet admitted at his deposition that such new evidence is irrelevant to his critique of Herman Miller's witnesses.

Not only does Mr. Mallouk's report fail to respond to the actual content of any of the three Herman Miller witnesses, but his own purported "research" (consisting essentially of a small handful of internet searches) actually undermines his stated conclusions – in particular his unstated but implied criticism of the methodology employed in the Englis consumer survey in which respondents were screened to be limited to chair purchasers or intended purchasers for less than $599.  However, he concedes that Belnick's copies of the Eames chairs are never sold for more than $599. And the new evidence consistently refutes Mr. Mallouk's premise that survey respondents should have been permitted to compare prices directly: none of his own research shows any such direct cross-references to Herman Miller's genuine chairs.  This includes the Belnick copies, which are marketed on Belnick's own websites but include no ability to compare prices directly with Herman Miller.

As further shown in Herman Miller's separate motion to exclude improper evidence of third-party sales, the limited evidence of third-party sales of copies of the Eames chairs that Mr. Mallouk relies thus is irrelevant to Herman Miller's theories of infringement: including that individuals who have seen and are familiar with the famous

Eames chairs will search for them online and find copies of websites such as Belnick's where there is no opportunity to compare the copies with the originals; and that even if consumers have a general understanding of price, they will assume, given the striking similarities, that Belnick is associated with Herman Miller in some way.  (In a similar manner, consumers are familiar with cars sold by Honda or Toyota having very similar body types to Acura and Lexis models.  Such sponsorship or affiliation confusion is squarely within the scope of the Lanham Act.)

Moreover, although beyond the scope of any of Herman Miller's expert reports, none of the new evidence discloses who makes the copies or the volume(s) of any sales; each merely shows the name of the online retailer.  Mr. Mallouk offers no facts to assess whether or not all of the copies come from the same or a small number of manufacturers – perhaps even the same Chinese manufacturer that makes the copies sold by Belnick. Thus, not only does Mr. Mallouk provide no analysis of the three expert reports he says he was trying to rebut, the new evidence he gathered actually confirms the correctness of the methodology employed by Dr. Englis.

Regardless, Mr. Mallouk's report is not a proper rebuttal and should be excluded. Belnick should only be permitted to offer evidence in support of its case in chief to the extent it produced such information in discovery.

Finally, although Mr. Mallouk professes no expertise in trademark law and does

not appear to understand the grounds for Herman Miller's claims of infringement, he all-too-willingly volunteers opinions on the ultimate issue of likelihood of confusion.  In so doing, he simply confirms his bias as a former VP of Belnick, who in 2018 replaced the founders of the company, Sean Belnick and Gary Glazer, after they sold the company.

## II.    <u>BACKGROUND</u>

### A.    <u>Belnick's Limited Discovery Responses</u>

During fact discovery in this case (which ended on December 12, 2019 – *see* Dkt. 88), Belnick was obliged under Local Rule 84 to have identified in its Initial Disclosures "a detailed factual basis for the defense or defenses and any counterclaims or crossclaims asserted by defendant in the responsive pleading."  In its March 2019 Initial Disclosures, the only purported evidence that Belnick pointed to on the question of secondary meaning was a listing of nine URLs of purported third party infringers. (Belnick Initial Disclosures (Ex. 1[1]), pp. 2-3.)  In its April 2019 Interrogatories, Herman Miller asked Belnick to "STATE IN DETAIL all facts upon which you base any challenges to the validity of Herman Miller's asserted trade dress rights" (Interrogatory No. 2), and "Identify any product designs by a non-party to this lawsuit that are sold in the United States that Belnick contends are relevant to the level of recognition or fame of Herman Miller's

---

[1] "Ex." refers to exhibits to the accompanying Declaration of Jonathan Moskin ("Moskin Dec."), unless stated otherwise.

asserted product designs" (Interrogatory No. 14).  Here again, Belnick's only "evidence" supplied in response was an identification of six third-party URLs selling infringing products.[2]  (Responses (Ex. 2), pp. 2-13, 22-23.)  As is relevant here, Mr. Mallouk's report goes well beyond the scope of any information that Belnick actually provided in fact discovery in this case, as discussed below.

**B.  Belnick Offered No Affirmative Expert Witnesses And Was Limited To Rebuttal Only**

Belnick initially identified no expert witnesses (including in its March 2019 Initial Disclosures, which otherwise require disclosure of such witnesses under Local Rule 84). Notably, although Mr. Mallouk was an executive of Belnick at the time, Belnick failed to identify him even as a potential *fact* witness in its mandatory Initial Disclosures, meaning that Herman Miller was not otherwise on notice of Mr. Mallouk as someone with any possible relevant knowledge of the case.  (Ex. 1, Initial Disclosures Attachment A.)  This definitively excludes Mr. Mallouk from offering any fact witness testimony,

---

[2] Note that concurrently herewth, Herman Miller has filed a Motion to preclude Belnick from relying upon purported evidence of third party infringement generally, on the grounds that Belnick's evidence is flawed (for example, including non-US sellers), and on the grounds that the nominal existence of infringers in the market actually supports the conclusion that Herman Miller's designs are famous – indeed, it is the very reason they are copied.  To prove abandonment of rights, Belnick would have needed to produce data showing infringers sold in such overwhelming quantities, and over such a long time, that they completely displaced Herman Miller. Belnick has no such evidence: it just has a few URLs.

whether couched as expert testimony or otherwise.

Despite Belnick never identifying any affirmative expert witnesses of its own, Herman Miller agreed to amend the schedule to permit service of rebuttal expert reports by January 17, 2020, on which date Belnick served the Mallouk report.  (Dkt. 86.) Moreover, Herman Miller's own Initial Disclosures made clear as of March, 2019 that it intended to offer in evidence a consumer survey.  (Herman Miller Initial Disclosures (Ex. 3), pp. 7-8.)  Belnick is a large company with significant resources, and it could have conducted a survey of its own, but either elected not to or has chosen not to rely it.

### C.    Mr. Mallouk's Inadequate Knowledge And Limited Research

Mr. Mallouk asserts no specific "expertise," but says simply that certain work experience "has afforded me a knowledgeable view of the furniture market, and the ecommerce landscape for furniture." (Mallouk Report,[3] p. 5.)  At his deposition he said his expertise was "selling furniture online," (Tr.[4] 58:11), but admitted that "[t]he consumer decisioning is not within my area of expertise." (Tr. 118:23-119:2.)  Mr. Mallouk has never published anything on the subject himself, been recognized anywhere as an expert or been retained as an expert.  (Tr. 59:25-60:10.)  Nor could he identify anything he had ever read on the subject – other than a single informal high level

---

[3] The Mallouk Report is filed herewith as Exhibit 4 to the Moskin Declaration.

[4] "Tr." refers to the transcript of the deposition of Mr. Mallouk, excerpts of which have been concurrently filed as Exhibit 5 to the accompanying Moskin Declaration.

summary by one e-commerce company, BigCommerce (Tr. 64:7-65:10; 70:24-71:13;
Ex. 6 hereto), which he said acknowledged price is important to consumers.  However,
the 2017 report concerned what it termed "Omni-Channel" retail, which it defined as
retailers having both physical and online presences (which is not true of Belnick). (Ex. 6
at 13.)  The report specifically addressed only electronics, clothing, accessories, health
and beauty, and entertainment (*id.* at pp. 20-21), without a word about furniture
purchasing.  Nor did it address the presence of knock-off products or how capable
consumers are in distinguishing copies from genuine goods.  While the report indicated
price is important (*id.* p. 26), it was entirely silent on how price figures into specific
shopping decisions or how consumers go about searching for products in their price
range.

Not only does Mr. Mallouk claim no knowledge of "consumer decisioning," he
has no experience with consumer psychology and no expertise in assessing consumer
sophistication.  (Tr. 71:14-71:22.)  Nor does he have any relevant knowledge of
trademark law of the relevant concepts of likelihood of confusion.  (*See*, *e.g.*, Tr. 71:14-
17; 84:1-85:10; and 87:12-91:6.)  Instead, having no direct knowledge of consumer
decision-making (for furniture or anything else) he rests on his experience with the
automated processes *sellers* use to promote their goods on the internet.  Yet, only two of
his past jobs even involved in retailing furniture.  First, while still a student, he worked

part-time at Wayfair from 2005 to 2011.  He did not finish his studies until 2013, and at the time, Wayfair was merely a start-up.  In that time, he had very little direct contact with customers (only very early on).  (Tr. 23:23-24:11.)  He then joined Belnick as a Vice President in November 2018, just after it was sued, and he left in April 2019.  He served in place of the original founders after they sold the company to a large Connecticut-based private equity firm, Sterling Capital Partners.  While there, he was primarily involved in picking new product lines. (Tr. 34:3-17, 42:5-8.)  Thus, he has had no interaction with furniture consumers since his early days at Wayfair.

He contends that sellers may use sophisticated software to track pricing by their competitors and adjust their own pricing accordingly, but his report says nothing about how furniture buyers search for furniture online or in bricks and mortar stores or how they go about searching for products, comparing prices or assessing the genuineness of goods.  (Tr. 124:1-126:24.)

The BigCommerce report does suggest that at least the shoppers it monitored *begin* their online shopping in marketplaces such as Amazon and eBay, *not how they proceed thereafter.*  (Ex. 6, p. 13.)  All that Mr. Mallouk did was to run a few searches on specific marketplace websites such as Amazon, eBay, Walmart, Target and Wayfair (i.e. the *starting points* identified by BigCommerce, if it is accurate).  He looked no further.  He used the search terms "ribbed back office chair" and  "herman miller eames

aluminum group/soft pad office chair," yet his report does not explain why he chose these search terms or why he has any understanding that this is how some relevant class of consumers in fact searches.

For instance, Ex. A to his report purports to show that on one unknown date he searched "herman miller eames aluminum group office chair" on Amazon and found various retailers selling copies of the Eames chairs for $492 or less. No manufacturers are identified and no sales volumes indicated. Ex. B was similar except it had one copy of the Eames Soft Pad chair for $869; the rest were under $492 and no manufacturers are identified. Exs. I and J purport to be similar searches for "ribbed back office chair" on Amazon. Ex. N is a similar search on eBay for ribbed back office chair. No genuine Herman Miller chairs are found on these searches, so the premise of his report (that consumers can compare prices) is either untested or simply contradicted by his actual research. For no marketplace he checked did he attempt to show how many, if any, of the copies had been sold or who makes them. (Tr. 116:24 – 117: 2.)

Exs. U, W and Z purport to show that Wayfair sells a copy of the Eames chairs (although how and when he searched is unknown), all for $336 or less, and Exs. X and Y purport to show that Wayfair sells no genuine Herman Miller chairs, so that no direct price comparisons could be made – at least on the day Mr. Mallouk did his search. There is no information how many (if any) such chairs have ever been sold or who makes them.

9

Exs. F, G and K show one of Defendant's chairs alone, with no ability to compare prices directly.  Exhibits L, M, O, P, Q and R show genuine Herman Miller products, but there is no ability to compare prices.

Indeed, although Mr. Mallouk sought to argue at his deposition that Dr. Englis' survey should have shown potential purchasers the comparative pricing of the Eames originals and the Belnick copies, none of the sites he found provided any such basis for any such comparison, and he admits that his efforts to gather information about third-party sales had nothing to do with the Englis survey methodology (Tr. 108:15-21):

> Q:  Your report includes no analysis of how that – the existence of third-party sellers affects the validity of Dr. Englis' survey, does it?
>
> A:  No.  The context of which I brought up third-party sellers is that – is to describe the broad availability of similar style chairs in the marketplace.

In other words, his report is not for rebuttal, but instead to supplement belatedly and improperly Defendant's discovery responses, which identified only a small number of third-party sellers of other purportedly infringing products.

For none of the sites did he attempt to determine if the products were all made by the same manufacturing source in China as used by Belnick, or how many chairs any of them had sold – whether zero, 10 or 100 – or for how long.  There are no dates on any of his searches.  None of these sites was among those identified by Belnick in its discovery

responses concerning any third party sales of similar copies.[5]

### D.   Mr. Mallouk Does Not Rebut Herman Miller's Experts

Regarding Dr. Englis' survey, Mr. Mallouk did not take issue with any specific conclusions, which assessed the reactions of 1000 individuals to the two sample chairs under controlled conditions and found legally significant levels of confusion.  He agrees he is not competent to assess the proper methods for consumer research (a task for which Belnick hired a separate expert, James Berger.)  (Tr. 71:20-22, 89:22-90:24, 92:9-14.) Moreover, Mr. Mallouk's research concerning pricing is entirely consistent with Dr. Englis' survey insofar Mr. Mallouk cites no instances of Belnick chairs being offered at retail for more than $599 and cites no instances where consumers would be able to make direct price comparisons between Herman Miller chairs and Belnick's copies.  Nor does he cite any examples where the manufacturing sources of any copies are identified (as distinct from the retail channels displaying the unbranded chairs).  Belnick itself admits its accused chairs are not branded in any way.  (Belnick Tr. (Ex. 7) at 135:12 – 136:15.)

Based on the above, Mr. Mallouk also proceeds to offer an opinion on the ultimate question of likelihood of confusion, saying that simply because prices differ for the products, no one will be confused.  (Mallouk Rep. (Ex. 4), p. 1.)  In addition to his

---

[5] In its Initial Disclosures and Responses to Interrogatories, served in March and May, 2019, Belnick identified only about 14 third party websites.

admitted ignorance of consumer psychology and "consumer decisioning," he does not purport to have any expertise in trademark law or the types of confusion that are actionable. Likewise, despite a lack of any relevant experience in product design or consumer psychology, but simply as an advocate, he argues that the small differences in the arms of the parties' chairs will prevent confusion, but admits he has no relevant knowledge. (*Id.*, p. 3; Tr., Ex. 5 at 117:3-119:2.) Rather, he is simply offering these views as an advocate for his former employer rather than as an expert.

Not only is Mr. Mallouk's limited research and report entirely consistent with Dr. Englis' research (and admittedly conducted for reasons irrelevant to the Englis report), he also identifies no genuine disagreement with the expert report of Ms. Melinda K. Williams. (*See* concurrently filed Declaration and Report of Melinda K. Williams.) The scope of Ms. Williams' expert report was very limited, and its somewhat obvious general conclusions about the furniture market are not legitimately in dispute. Specifically, Ms. Williams lays a basic foundation for the fact-finder to understand generally that (1) end users of furniture may be susceptible to confusion if they are looking for a particular product that they know by sight, but that they may not know the brand name or price of, and (2) that some end users that buy furniture in large quantities – like companies equipping conference rooms – will often employ middlemen agents (like interior designers) to acquire furniture, and such middlemen may substitute the requested

12

products for lower cost look-alikes in an attempt to stay within a budget. (*See* Williams Report, Sections I and II.) Ms. Williams' testimony does nothing more than explain these broad, generally-accepted propositions about the furniture market to lay a foundation. It will be left to the *fact* witnesses to debate the actual risk of harm to Herman Miller from Belnick's accused conduct.

Mr. Mallouk nowhere actually rebuts Ms. Williams' conclusions. For example, Mr. Mallouk nowhere rebuts that consumers unfamiliar with brand names or pricing might be susceptible to confusion by knock-offs, nor does Mr. Mallouk dispute that a business seeking 10 or 20 Eames chairs could have an interior decorator make the purchase and unknowingly receive 10 or 20 copies from a knock-off supplier such as Belnick (which bear no branding and are similar enough to the originals to pass undetected). Thus, instead of opining as a rebuttal expert, Mr. Mallouk is improperly trying to act as a stealth *fact* witness on the ultimate question of whether Belnick is liable for creating a likelihood of confusion in the marketplace. That question is for the actual fact witnesses in the case to debate – not Mr. Mallouk, who was never even identified as a knowledgeable witness in Belnick's own Initial Disclosures.

Likewise, Mr. Mallouk does not in fact rebut any of the analysis of Herman Miller's furniture history expert, John R. Berry, who opined that Herman Miller's chairs are historically significant in the furniture industry. (*See* concurrently filed Declaration

and Report of John R. Berry.)  Mr. Mallouk fails to address any of the history set forth in

Mr. Berry's report, much less rebut it.  Mr. Berry also acknowledges that there are some

copyists, which he cites as some modest evidence of the considerable recognition the

chairs enjoy.  Mr. Mallouk does not disagree with anything Mr. Berry states and makes

no effort to quantify the examples of copying he identifies or to assess the number of

sources of these copies, which may all simply come from one or two manufacturers.

## III.   <u>ARGUMENT</u>

F.R.E. 702 provides that a witness qualified as an expert may offer opinion

testimony if "(a) the expert's scientific, technical, or other specialized knowledge will

help the trier of fact to understand the evidence or to determine a fact in issue; (b) the

testimony is based on sufficient facts or data, (c) the testimony is the product of reliable

principles and methods, and (d) the expert has reliably applied the principles and methods

to the facts of the case."  Furthermore, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

579 (1993) ("*Daubert I*"), assigns the district court a gatekeeping role to ensure that

purported expert testimony is "not only relevant, but reliable."  *Id.* at 589.  An expert

witness is allowed to offer opinions if such opinions "have a reliable basis in the

knowledge and experience of his discipline."  *Id.* at 592.  The burden of establishing

qualification, reliability and helpfulness lies with the party offering the expert opinion.

*See McClain v. Metabolife Int'l, Inc.* 401 F.3d 1233, 1238 (11th Cir. 2005).

14

A. **Mr. Mallouk Is Not Qualified To Opine On Consumer Shopping or Likelihood of Confusion**

Belnick is unable to sustain its burden of establishing that Mr. Mallouk is qualified to opine on consumer shopping for furniture; consumer sophistication on the subject of knock-off products such as Belnick's or the likelihood of confusion.  Nor does he have any knowledge concerning consumer survey research.[6]

Nor does Mr. Mallouk's review of one promotional article from BigCommerce overcome his lack of knowledge concerning "consumer decisioning." *Savage v. Conrad*, No. 1:14-CV-4103-ODE, 2016 WL 11639660, at *7 (N.D. Ga. Nov. 21, 2016) (perusing the SEC's website "to gain some general knowledge about Ponzi schemes" insufficient to qualify proposed expert to opine on whether certain entities were Ponzi schemes); *Trilink*, 583 F. Supp. 2d at 1306 (excluding proposed expert whose mechanical engineering background and research on the chain saw industry in preparation for the case "gave him background--not expertise--with regard to saw chain"). *Accord, Wright*

---

[6] *See, e.g.*, *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 458 (E.D. Va. 2017) (four decades of experience as a market research consultant did not qualify expert to "opine on consumer confusion or proper survey methods in a trademark case."); *see also*, *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) (chemist could not testify on related topics); *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562-3 (11th Cir. 1998) (excluding expert statistician from testifying concerning competition in the marketplace for chlorine); *Greater Hall Temple Church of God v. S. Mut. Church Ins. Co.*, No. 2:17-CV-111, 2019 WL 4147589, at *9 (S.D. Ga. Aug. 30, 2019) (expert with engineering degree who ran his own roofing business precluded from opining on the durability of a church's roof).

*v. Case Corp.*, No. 03–cv–1618–JEC, 2006 WL 278384, at *3 (N.D. Ga. Feb. 1, 2006).

Here, Mr. Mallouk admits that "consumer decisioning" is not within his "area of expertise," yet his entire report is premised on some supposedly superior knowledge about this subject to permit him to opine on how consumers decide to buy products. Indeed, Mr. Mallouk was unable to identify any meaningful respect in which his knowledge of selling chairs online (as distinct perhaps from procurement) was different from others at Belnick, including Sean Belnick.  (Tr. 103:20-106:22.)

Mr. Mallouk has never previously been retained as an expert; he has never published anything in the field and is not recognized as an expert.  (Mallouk Rep., Ex. 4, pp. 6-7; Tr., Ex. 5 at 59:25-60:10.)  He has only limited experience even in marketing furniture, and the only "authority" cited in his report is little more than a marketing brochure from BigCommerce.  (Mallouk Rep., Ex. 4, p. 4.)  The report nowhere even discusses marketing of furniture online or sales of knock-offs.  Mr. Mallouk's only qualification appears to have been that he worked briefly as a VP at Belnick, and thus was recruited by the current CEO because he could be an advocate (not expert) for the company.  (*Id.* at pp. 6, 8-9.)

He also incorrectly criticizes Dr. Englis for focusing his study on likely purchasers of Belnick's products, evidently unaware of the blackletter law that in surveys assessing whether an accused infringer is likely to cause confusion (i.e., "forward confusion") the

relevant consumers are those in the infringer's market. *Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC*, 685 F. Supp. 2d 1360, 1373 (N.D. Ga. 2010) ("The appropriate universe should include a fair sampling of those ***purchasers most likely to partake of the alleged infringer's goods or services***." (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980)); *Phelan Holdings, Inc. v. Rare Hosp. Mgmt., Inc.*, No. 8:15-CV-2294-T-30TBM, 2017 WL 1135266, at *7 (M.D. Fla. Mar. 27, 2017) (in forward confusion survey, the target audience is the junior user's customer base; *See* 6 McCarthy on Trademarks § 32:159 (5th ed.) (same).

Mr. Mallouk has no relevant expertise to opine on how price is relevant to consumer decisions to purchase the accused products, and his own research confirms that consumers assessing knock-off products such as the Belnick accused chairs have no ready or apparent way to compare pricing directly. Indeed, he admits that that was not really even the purpose of his report, which rather was simply to supplement improperly Belnick's discovery responses, which Belnick evidently recognizes are inadequate. (Tr. 108:11-21 (quoted in part above), 124:16-126:14.)

## B.   Mr. Mallouk's Report Is Not Proper Rebuttal

A rebuttal report is "***limited to contradicting or rebutting evidence on the same subject matter identified by another party and is not an opportunity to advance new opinions or new evidence***….Thus, [a party] cannot use the rebuttal argument to admit

completely new opinions from [their expert]." *Coward v. Forestar Realty, Inc*., 282 F. Supp. 3d 1317, 1331 (N.D. Ga. 2017) (emphasis added) (citation omitted).  *See also*, *Gaddy v. Terex Corp*., No. 1:14-CV-1928-WSD, 2017 WL 3276684, at *3 (N.D. Ga. Aug. 2, 2017) ("A party's opportunity to submit a rebuttal expert report is not license to expand its case-in-chief…. A rebuttal expert report is not the proper 'place for presenting new arguments, unless presenting those arguments is substantially justified and causes no prejudice.'") (quoting *STS Software Sys., Ltd. v. Witness Sys., Inc*., No. 1:04-CV-2111-RWS, 2008 WL 660325, at *2 (N.D. Ga. Mar. 6, 2008); *Capital Sec. Sys., Inc. v. NCR Corp*., No. 1:14-CV-1516-WSD, 2017 WL 2363749, at *7 (N.D. Ga. May 31, 2017) (striking arguments first presented in expert's rebuttal).  Even if "an opinion restates one offered in an original expert report, it may not be offered in rebuttal unless it rebuts an opinion offered by the opposing expert." *Gaddy*, 2017 WL 3276684 at *3.

Mr. Mallouk's report does not actually rebut the conclusions of Dr. Englis, Mr. Berry, or Ms. Williams.  Instead, his report is a transparent attempt to present under the guise of expert testimony new purported factual evidence that Belnick otherwise failed to produce in discovery.  Mr. Mallouk's report simply consists of a small number of searches for "ribbed back office chair" or "herman miller eames aluminum group/soft pad office chair" on a small number of marketplaces. (Mallouk Rep., Ex. 4, pp. 2-3.)  He admits that none of this research had anything to do with rebutting Dr. Englis, but instead

was meant simply to improperly develop the factual record of third-party sales (which Belnick failed to do in discovery in support of its own defenses). (Tr., Ex. 5 at 108:11-21.) He admitted separately his report had nothing to do with Mr. Berry's report on the historical significance of the Eames design or Ms. Williams' report on how product substitution works generally in the furniture market. (Tr. 110:21-114:10.)

None of his research even purports to show that shoppers are able to make direct price comparisons with genuine Herman Miller products; none shows the manufacturing source of any of the copies, and none shows the volume of sales of the copies. Mr. Mallouk concedes the bare existence of third party sellers is irrelevant to the Englis report or the validity of the Englis survey. (Tr. 108:15-21.) And virtually all of the copies are priced less than $599 – exactly as Dr. Englis set up his survey. Mr. Mallouk admits he is not aware that any Belnick copies are sold for more than $599. (Tr. 109:14-23.)

His report is also entirely consistent with Ms. Williams' report concerning product substitution, admitting that Ms. Williams' analysis of product substitution is not even relevant his report. (Tr. 114:5-10.) He likewise never actually addresses or disputes Mr. Berry's analysis of the iconic stature of the Eames designs. He admits he did not even attempt to address the historic importance and iconic nature of the Eames designs. (Tr. 110:16-111:24.) Nor does he address Mr. Berry's statement that the existence of some modest copying (such as Mr. Mallouk seeks to document) is actually some

19

evidence of the great recognition the Eames designs enjoy.  (Tr. 111:25 – 112:15.)  The Mallouk report thus is not rebuttal, it is simply an effort to supplement the record where Belnick failed in discovery to produce any relevant information to show that more than a small number of retailers at unknown times sold unknown quantities of copies manufactured by unknown sources.

### C.     <u>Belnick May Not Use Mr. Mallouk To Introduce Purported Evidence That It Failed To Properly Produce In Discovery</u>

As discussed in Section II.A and in Herman Miller's separate motion to exclude improper evidence of third-party sales, Belnick was obliged to have produced whatever purported evidence that it had about third party infringement during discovery, and those disclosures were limited to an identification of a handful of website URLs.  (Belnick also produced several website printouts on November 25, 2019 that Herman Miller contends should be excluded for other reasons.)  However, Mr. Mallouk's Report – which was served a month after the close of fact discovery – is used a vehicle to identify a series of new purported infringing websites that had never been previously identified.  This is improper under Fed. R. Civ. P. 37, and such matter must be excluded, along with any of Mr. Mallouk's opinions that are based upon it.  "When a party fails to comply with Rule 26, the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation was either justified or harmless." *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277, 2016 WL 3102225, at *5 (S.D. Fla. June 2, 2016).

*See also Bayer Healthcare Pharm., Inc. v. River's Edge Pharm., LLC*, No. 1:11-CV-1634-HLM, 2015 WL 11142427, at *9 & 12 (N.D. Ga. May 21, 2015) (Court striking evidence and legal arguments disclosed for the first time during expert reports).   In particular, had the material been properly identified months before, Herman Miller could have taken discovery concerning it, but by this stage of the litigation no longer had that opportunity.  *See*, *e.g.*, *mophie, Inc. v. Shah*, No. SACV1301321DMGJEMX, 2014 WL 12603075, at *6 (C.D. Cal. Dec. 2, 2014) (stating that expert deposition "does not cure the prejudice…because they no longer had the ability to conduct non-expert discovery to secure evidence that would be pertinent.").

### D. <u>Mr. Mallouk's Testimony Is Irrelevant</u>

Expert testimony must be relevant.  (*See* F.R.E. 402: "Irrelevant evidence is not admissible").  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (citations omitted).   Under *Daubert,* the second inquiry is the "fit" requirement, is directed "primarily to relevance."  *Daubert I*, 509 U.S. at 591.  However, the "fit" requirement is not merely a reiteration of the general relevancy requirement under Rule 402.  *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) ("*Daubert II*").  Instead, such a determination is meant to take into account that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty

in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert I*, 509 U.S. at 595 (citation and quotation signals omitted); *see also United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) (Expert testimony that will mislead or confuse the jurors rather than assist them is inadmissible for the additional reason that "expert testimony may be assigned talismanic significance in the eyes of lay jurors").  "Federal judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that [the evidence] speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert II*, 43 F.3d at 1321 n.17.  Proposed expert testimony "generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63.

Because Mr. Mallouk's report draws an erroneous conclusion that consumers can and do make price comparisons between Herman Miller and Belnick that he thinks Dr. Englis should have considered and which he contends supports his conclusion on the ultimate issue of likelihood of confusion, his testimony at trial would be irrelevant and confusing to the jurors and should be excluded.  However, his own research shown no basis to conclude that purchasers of Belnick's office chairs make price comparisons with Herman Miller chairs, much less that they appreciate the difference in the first place.

22

While Herman Miller hardly need prove up any opposite conclusions where Belnick's expert lacks grounds for his own, it bears noting that the kind of confusion that Herman Miller is most worried about is precisely among end users who do not even appreciate that they are dealing with a knock-off in the first place, much less those who stop to make a price comparison with Herman Miller's originals.  Mr. Mallouk's circular logic presupposes that end users are connoisseurs who are already familiar with Herman Miller's brand names and pricing, and then argues essentially that "persons who would not be confused, will not be confused" once they compare prices.

As a threshold matter, even sophisticated consumers may believe that Belnick is selling some kind of related lower cost brand that is affiliated with or under license from Herman Miller, the way that Acura and Honda are affiliates selling cars with very similar body styles, or the way that companies sometimes get permission to sell replicas of famous products.  Without consent, that would be actionable trademark confusion.  15 U.S.C.  § 1125(a)(1)(A) (making actionable any confusion as to affiliation or sponsorship); *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1201 (11th Cir. 2001) ("[A] trademark owner has protection against use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner.") (internal quotations and citation omitted).  But even if connoisseurs

23

were not confused, that is obviously not the target market that Herman Miller is concerned about.  As articulated more fully in Herman Miller's concurrent Motion to Exclude the testimony of James Berger,[7] Herman Miller's position in this case is that confusion is likely among all kinds of end consumers: everyone from the person making buying decisions for a large company, to an individual appointing a home office.  While these people may recognize the Eames Aluminum Group chairs as being a distinct brand based on their appearance, they need not have any idea what is the brand name, or that the name of the manufacturer is Herman Miller, or what the original chairs usually cost. And even if they have some vague idea that the chairs are expensive, they might believe that Belnick is lawfully selling them at a discount.

As Mr. Mallouk ultimately admitted, the extent of the "evidence" he considered was limited to third-party websites purporting to sell copies of the famous Eames designs, and such "evidence" was included as a way to improperly supplement Belnick's deficient discovery responses regarding its own principal affirmative defense.  However, even in this respect, while not proper rebuttal, his report fails even to attempt to determine the quantities of any such third-party sales or the manufacturing source of such knock-off

---

[7] Belnick experts' premises also ignore post-sale confusion, wherein someone sees a Belnick chair in use (and thus does not know what it cost), and mistakenly believes it is genuine, which is similar to post sale confusion engendered by counterfeit Rolex watches: the purchaser may know it's a fake but others believe it is genuine.

24

products.  Belnick is a very large company.  Had it wanted to conduct a proper consumer survey to assess the likelihood of confusion, it could have done so.

### E.    Mr. Mallouk Is Not Permitted To Testify to the Ultimate Issue

Despite admitting that he has no expertise regarding "consumer decisioning," Mr. Mallouk repeatedly offers his opinion that consumer confusion is unlikely because of price differences.  He also opines that consumers will take notice of minor differences between the Eames originals and the Belnick copies.  This type of testimony is expressly forbidden under federal law.[8]

### F.    Mr. Mallouk Is Biased

Finally, Mr. Mallouk's willingness to offer opinions on issues as to which he is manifestly unqualified simply reflects his bias as a former Belnick Vice President with a personal interest in facilitating ongoing sales of knock-offs to advantage his former colleagues.  Withal, he could identify no respect in which the subjects about which he purports to have knowledge cannot be addressed equally well by other Belnick fact witnesses.  Hence, there is no prejudice to Belnick in excluding Mr. Mallouk.

## IV.    CONCLUSION

Herman Miller respectfully requests that Mr. Mallouk's testimony be precluded.

---

[8] *See, e.g., Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006); *Montgomery v. Aetna Cas. & Sur. Co*., 898 F.2d 1537, 1541 (11th Cir. 1990).

Dated:  March 2, 2020

Respectfully submitted,

_s/ Jonathan E. Moskin_
Jonathan E. Moskin (admitted _pro hac_)
email:  jmoskin@foley.com
**FOLEY & LARDNER LLP**
90 Park Avenue
New York, NY 10016-1314
Phone: 212.682.7474
Facsimile: 212.687.2329

Jean-Paul Ciardullo (_pro hac_)
email:  jciardullo@foley.com
**FOLEY & LARDNER LLP**
555 South Flower Street, Suite 3500
Los Angeles, CA 90071-2411
Phone: 213.972.4500
Facsimile: 213.486.0065

Amanda G. Hyland
email: ahyland@taylorenglish.com
Georgia Bar No. 325115
**TAYLOR ENGLISH DUMA LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339

Attorneys for Plaintiff
HERMAN MILLER, INC.