## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

HERMAN MILLER, INC.,

               Plaintiff,

     v.

BELNICK LLC,

               Defendant.

Case No. 1:18-cv-05012-WMR

## HERMAN MILLER, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO PRECLUDE BELNICK LLC'S PURPORTED EVIDENCE OF <u>THIRD PARTY INFRINGEMENT</u>

## <u>REDACTED PUBLIC VERSION</u>

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................1

II.  TRADE DRESS LAW CONCERNING SECONDARY MEANING ...........2

III. THE ICONIC EAMES ALUMINUM GROUP ...............................................7

IV.  BELNICK'S PURPORTED EVIDENCE OF THIRD PARTY
     COPYING SHOULD BE EXCLUDED .......................................................10

     A.   An Overview Of Why Belnick's Materials Are Not Probative ..........10

     B.   Belnick's Written Discovery Responses (Category 1) Do Not
          Support The Relevance Of Any Purported Third Party
          Infringers ........................................................................................15

     C.   Belnick's Website Compilation Exhibit (Category 2) Is Riddled
          With Inaccuracies And Is Not Probative............................................18

     D.   Belnick's Corporate Witness Confirms Belnick's Lack Of
          Knowledge........................................................................................19

     E.   The Mallouk Report (Category 3) Lacks Any Usable Evidence,
          And Is Otherwise Procedurally Improper And Excludable ...............22

          1.   Mr. Mallouk's Unsupported Conclusory Statements Are
               Inadmissible ............................................................................22

          2.   Belnick Cannot Use Mr. Mallouk To Introduce New
               "Evidence" That It Failed To Provide In Fact Discovery.........23

     F.   Belnick's Sparse And Conclusory Non-Evidence Is Irrelevant
          And Highly Prejudicial......................................................................24

V.   CONCLUSION............................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Am., Inc. v. Skechers United States*,
    No. 3:15-cv-01741-HZ, 2017 U.S. Dist. LEXIS 122459 (D. Or.
    Aug. 3, 2017) .................................................................................................2

*AmBrit, Inc. v. Kraft, Inc.*,
    812 F.2d 1531 (11th Cir. 1986) ......................................................................2

*Asics Corp. v. Skechers U.S.A.*,
    No. 07-0103, 2007 U.S. Dist. LEXIS 38048 (C.D. Cal. Apr. 25,
    2007) .............................................................................................................11

*Bagwell v. Peachtree Doors & Windows, Inc.*,
    No. 2:08-CV-191-RWS-SSC, 2011 U.S. Dist. LEXIS 42262 (N.D.
    Ga. Feb. 8, 2011) ..........................................................................................15

*Breakers of Palm Beach, Inc. v. Int'l Beach Hotel Dev.*,
    824 F. Supp. 1576 (S.D. Fla. 1993) ...........................................4, 6, 7, 8, 15, 16

*Callaway Golf Co. v. Golf Clean, Inc.*,
    915 F. Supp. 1206 (M.D. Fla. 1995).............................................................2, 9

*Cathedral Art Metal Co. v. Divinity Boutique, LLC*,
    No. 1:18-cv-141-WSD, 2018 U.S. Dist. LEXIS 13385 (N.D. Ga.
    Jan. 26, 2018)..................................................................................................6

*Century 21 Real Estate Corp. v. Sandlin*,
    846 F.2d 1175 (9th Cir. 1988) .......................................................................3

*ChemFree Corp. v. J. Walter, Inc.*,
    No. 1:04-CV-3711-JTC, 2009 U.S. Dist. LEXIS 131044 (N.D. Ga.
    May 26, 2009).................................................................................................23

*Cumulus Media, Inc. v. Clear Channel Communs., Inc.*,
    304 F.3d 1167 (11th Cir. 2002) .....................................................................4

*Fla. Breckenridge, Inc. v. Solvay Pharm., Inc.*,
    No. 97-8417-CIV-RYSKAMP, 1997 U.S. Dist. LEXIS 17574
    (S.D. Fla. July 3, 1997) ................................................................................5

*Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*,
    91 F. Supp. 3d 1265 (S.D. Fla. 2015) ..........................................................2, 3

*FN Herstal SA v. Clyde Armory Inc.*,
    838 F.3d 1071 (11th Cir. 2016) .....................................................................3

*FN Herstal v. Clyde Armory, Inc.*,
    123 F. Supp. 3d 1356 (M.D. Ga. 2015) .........................................................12

*GamerModz, Ltd. Liab. Co. v. Golubev*,
    No. 8:10-CV-1466-T-27TGW, 2011 U.S. Dist. LEXIS 116608
    (M.D. Fla. Aug. 3, 2011) ...............................................................................3

*Goodin v. Geren*,
    Civil Action No. 1:06-CV-646-BBM, 2007 U.S. Dist. LEXIS
    105423 (N.D. Ga. Dec. 28, 2007) ................................................................15

*Goodman-Gable-Gould Co. v. Tiara Condo. Ass'n*,
    595 F.3d 1203 (11th Cir. 2010) ...................................................................17

*L.D. Richler Co. v. Davoil, Inc.*,
    192 F.3d 1349 (Fed. Cir. 1999) ...................................................................3, 6

*New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*,
    312 F. Supp. 2d 195 (D. Conn. 2004) ............................................................4

*Playboy Enters. v. Netscape Communs. Corp.*,
    354 F.3d 1020 (9th Cir. 2004) .....................................................................13

*Popular Bank v. Banco Popular*,
    9 F. Supp. 2d 1347 (S.D. Fla. 1998) ..............................................................2

*Robarb, Inc. v. Pool Builders Supply of the Carolinas, Inc.*,
    No. 1:87-cv-2102-HTW, 1991 U.S. Dist. LEXIS 22086 (N.D. Ga.
    Oct. 31, 1991) .......................................................................................5, 9, 13

*Unique Sports Prods., Inc. v. Babolat VS*,
   403 F. Supp. 2d 1229 (N.D. Ga. 2005)...................................................................3

**Statutes**

15 U.S.C. § 1057(b) ...................................................................................................8

15 U.S.C. § 1115 ..............................................................................................3, 4, 8

15 U.S.C. § 1127 .......................................................................................................2

**Other Authorities**

F.R.E. 401 and 402..................................................................................................22

F.R.E. 403 ................................................................................................................22

Fed. R. Civ. P. 30(b)(6)......................................................................................16, 18

Fed. R. Civ. P. 33(d) ...............................................................................................15

Fed. R. Civ. P. 37 ....................................................................................................21

Fed. R. Civ. P. 37(c)(1)............................................................................................17

Local Rule 84.1(B)...................................................................................................14

## I.   <u>INTRODUCTION</u>

Herman Miller respectfully brings this motion to preclude Belnick from introducing at trial misleading and irrelevant evidence and argument concerning alleged third party infringement of Herman Miller's chair designs.  Belnick seeks to argue that third party sales of infringing products somehow means that Herman Miller has abandoned its trade dress such that anyone can now copy it, and in support of this argument has supplied a handful of third party URLs and websites.

However, copying by third parties actually *supports* an inference that trade dress has secondary meaning and is valid.  To have been relevant to the opposite conclusion, third party copying would have had to have been so overwhelming, and occurred for so long, as to erase the Eames Aluminum Group brand from the public consciousness in the United States.  But Belnick has no actual **data** to support any such conclusions: it just has some website printouts.  Belnick does not even have proof that the third parties it identifies have sold *anything at all*, much less that they have overwhelmed Herman Miller's brand.  Indeed, many of the websites Belnick referenced (outside its actual discovery responses) are for non-US sellers, or are companies that Herman Miller has already pursued and shut down.  Belnick's conclusory non-evidence should be precluded to avoid significant juror confusion.  Furthermore, much of the material was not timely produced in discovery, and is separately excludable on those grounds as well.

1

## II.  TRADE DRESS LAW CONCERNING SECONDARY MEANING

In order to be protectable, trade dress must have acquired secondary meaning, which means that a substantial number of target consumers tend to recognize the product as a distinctive design that originates from a particular source, *i.e.*, that it is reflective of a brand.  *See, e.g., Popular Bank v. Banco Popular*, 9 F. Supp. 2d 1347, 1357 (S.D. Fla. 1998) ("Secondary meaning exists if a substantial number of existing or prospective customers understand the designation when used in connection with a business to refer to a particular person or enterprise.")  Notably, the law does not require that relevant consumers know the name of that source, but rather just that they believe there is an original one.[1]

Where trade dress has been registered with the U.S Trademark Office for more than five years, it becomes incontestable upon the filing of an affidavit by the owner.  *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 91 F. Supp. 3d 1265, 1275 (S.D. Fla. 2015).

---

[1] 15 U.S.C. § 1127; *AmBrit, Inc. v. Kraft, Inc*., 812 F.2d 1531, 1536 n.14 (11th Cir. 1986) ("Secondary meaning is the connection in the consumer's mind between the mark and the product's producer, whether that producer is known or unknown"); *adidas Am., Inc. v. Skechers United States*, No. 3:15-cv-01741-HZ, 2017 U.S. Dist. LEXIS 122459, at *24-25 (D. Or. Aug. 3, 2017) ("A showing of secondary meaning only requires proof that the public associates the trade dress with a single source, even if that source is anonymous.") (shoe trade dress) (citations omitted); *Callaway Golf Co. v. Golf Clean, Inc*., 915 F. Supp. 1206, 1212 (M.D. Fla. 1995)("Secondary meaning is the connection the consuming public associates between the trade dress and the product's producer, whether that producer is known or unknown.").

2

The secondary meaning of an incontestable mark may not be challenged except upon proof that the owner abandoned it and allowed others to copy it with impunity. *Id.*; 15 U.S.C. § 1115(b) (enumerating allowable defenses to incontestable status, including "(2) That the mark has been abandoned by the registrant").

Importantly, a trade dress owner need not prove that its use of a design is exclusive in order to show that the design has secondary meaning. *Unique Sports Prods., Inc. v. Babolat VS*, 403 F. Supp. 2d 1229, 1239 (N.D. Ga. 2005) (with respect to the requirement of showing "substantial exclusivity" in procuring a trademark registration, explaining that this requirement "makes an allowance for use by others which may be inconsequential or infringing"); *L.D. Richler Co. v. Davoil, Inc*., 192 F.3d 1349, 1352 (Fed. Cir. 1999) ("the district court, therefore, erred in suggesting that any use by others is sufficient to preclude an applicant's declaration of substantially exclusive use … there is a genuine issue of fact regarding the extent of the other companies' use – i.e., whether it was inconsequential or infringing."); *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1181 (9th Cir. 1988) (third party infringement "irrelevant" to existence of trademark rights).

Indeed, quite to the contrary, popular designs are frequently knocked off, which only confirms that they are popular: it was the very motivation for others to try to trade off the goodwill of the brand. *FN Herstal SA v. Clyde Armory Inc.,* 838 F.3d 1071, 1086

(11th Cir. 2016) (intentional copying is probative of secondary meaning); *GamerModz, Ltd. Liab. Co. v. Golubev*, No. 8:10-CV-1466-T-27TGW, 2011 U.S. Dist. LEXIS 116608, at *47 (M.D. Fla. Aug. 3, 2011) (intent to trade off brand can be inferred where it is apparent from the closeness of the copying, and such intent is probative of secondary meaning). Some famous designs are knocked off so much – like Rolex having fakes sold out of briefcases on street corners – that it is almost a cliché, but that does not prevent those brands from being able to enforce their intellectual property rights to combat knock-offs. Such brand owners – like Herman Miller – are in fact engaged in a constant battle against knock-offs, and for every infringer that they stop, new ones take their place. But, as with Rolex, the brand is strong and survives. *See Breakers of Palm Beach, Inc. v. Int'l Beach Hotel Dev.*, 824 F. Supp. 1576, 1584 (S.D. Fla. 1993) ("Plaintiff is not obligated to litigate against each and every potential infringer.").

The only way that a challenger could prove loss of secondary meaning of a trademark due to the presence of knock-offs in the market is with conclusive evidence that the brand owner either intentionally abandoned its brand, or allowed such widespread and overwhelming copying that all brand recognition was lost. *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*, 312 F. Supp. 2d 195, 210 (D. Conn. 2004) ("common usage may render trade dress that was once distinctive generic if, by virtue of the use, the dress can no longer be understood to represent a source of the product") (citations omitted); *see*

4

*also* 15 U.S.C. § 1115(b) (as to registered incontestable marks); *Cumulus Media, Inc. v. Clear Channel Communs., Inc.*, 304 F.3d 1167, 1175 (11th Cir. 2002) ("federal courts uniformly agree that defendants asserting an abandonment defense face a stringent, heavy, or strict burden of proof").

A good example of this principle can be found in *Robarb, Inc. v. Pool Builders Supply of the Carolinas, Inc.*, No. 1:87-cv-2102-HTW, 1991 U.S. Dist. LEXIS 22086, at *9 (N.D. Ga. Oct. 31, 1991):

> …defendants did not present sufficient evidence of the sales, distribution or advertisement of these third-party trade dresses to determine whether such trade dress diminished plaintiff's distinctiveness on the market.  Third-party usage occurring relatively recently, well after the Robarb Trade Dress was first put on the market, is entitled to little or no probative value, particularly when the extent of the use has not been shown.  Lilly Pulitzer, Inc. v. Lilli Ann Corp, 376 F.2d 324, 54 C.C.P.A. 1295 (C.C.P.A. 1967).
>
> Plaintiff's evidence showed that the third-party users, except possibly for one, had knowledge of Robarb and the Robarb Trade Dress prior to that party's adoption of its trade dress.  Defendants produced no evidence which shows that third-party usage has been so extensive as to undermine the inherent distinctiveness of the Robarb Trade Dress.  "**Third-party use of one or more suggestive or arbitrary elements of a plaintiff's trade dress renders that trade dress indistinct only if the third-party use is so extensive and so similar to plaintiff's that it impairs the ability of consumers to use the trade dress of the products to identify their source**."

5

Citing *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1537 (11th Cir. 1986) (emphasis added); see also *Fla. Breckenridge, Inc. v. Solvay Pharm., Inc.*, No. 97-8417-CIV-RYSKAMP, 1997 U.S. Dist. LEXIS 17574, at *12-13 (S.D. Fla. July 3, 1997) (same).

The foregoing principles were echoed by the court in *Breakers of Palm Beach, Inc. v. Int'l Beach Hotel Dev.*, 824 F. Supp. 1576, 1584 (S.D. Fla. 1993), which held (emphasis added):

> the proper inquiry is whether the third party use *significantly* diminishes the public's perception that the mark identifies services connected with the owner. *Univ. of Ga.*, 756 F.2d at 1545, n. 27. **Defendant has only pointed out that these uses exist, but has not demonstrated that they have any impact on the public's perception regarding the strength of Plaintiff's mark**.

Another good example of this principle can be found in *Cathedral Art Metal Co. v. Divinity Boutique, LLC*, No. 1:18-cv-141-WSD, 2018 U.S. Dist. LEXIS 13385, at *15 n.6 (N.D. Ga. Jan. 26, 2018) (emphasis added):

> Defendant did not submit evidence showing the extent of penetration of these products into the market or otherwise demonstrate the effect the existence of these products has on the consumer's perception of 'Amazing Woman' as an identifier of Abbey Press. [citing *Unique Sports*, 403 F. Supp. 2d at 1239] **The Court considers Defendants' evidence of third-party use inconsequential**.

Put another way, use of trade dress by third parties that is "inconsequential or infringing" is incapable of undermining secondary meaning, and the bare fact that third

party infringers exist is irrelevant without evidence of the extent and nature of their use. *L.D. Richler,* 192 F.3d at 1352; *Breakers of Palm Beach,* 824 F. Supp. at 1584.

Thus, if Belnick wanted to prove that Herman Miller's Eames Aluminum Group brand lost secondary meaning due to third party infringement, Belnick would have needed competent data supporting the conclusion that the brand had been so overwhelmed by copyists as to lose all distinctiveness. Pointing to a handful of websites without any proof of sales or even levels of traffic to the sites, or even any identification of manufacturing source, is not probative of the inquiry, and only shows that the Eames trade dress is popular and well-known enough to be knocked off, like Rolex.

## III.   THE ICONIC EAMES ALUMINUM GROUP

This Motion concerns the legal insufficiency of certain purported evidence proffered by Belnick challenging secondary meaning – as distinct from the evidence Herman Miller can produce to affirmatively prove secondary meaning. Nonetheless, so that the Court has proper context for this Motion, it bears briefly explaining at least some of the extensive grounds to conclude that the Eames Aluminum Group design is distinctive and well-known – indeed legally *famous*, as a 2016 jury found – and protectable as a brand identifier.

One of Herman Miller's most successful partnerships was with the husband and wife design team of Charles and Ray Eames, who are among the most celebrated

7

industrial designers in American history.   (Berry Expert Report, pp. 3-10, which accompanies this memorandum.)   In the 1950s, the Eameses developed the Eames Aluminum Group chair to be visually distinctive, stand-out piece of mid-century modern furniture.   (*Id*.)   Sample images of the Eames Aluminum Group chairs are included in **Appendix A** at the end of this brief.   The continued popularity of the products 60 years later is testament to their success, as further confirmed by its induction into the permanent collections of art museums across the country, including the Museum of Modern Art. (*Id*.)

In fact, the Eames Aluminum Group design it is one of the company's most popular and iconic brands, having sold hundreds of thousands of units, and having been the subject of tens of millions of dollars of marketing.  (Declaration of Casey Bond, ¶¶ 2-3.)   Because the Eames Aluminum Group chairs are commonly used for communal seating (such as in conference rooms), large numbers of people use and become familiar with the design without necessarily owning one of the chairs themselves.   (*Id*.)   The Eames Aluminum Group chairs have made countless unsolicited appearances in mass media, advertising, television, and movies, including recently the popular television show "Mad Men," which featured the chairs.   (*Id*.)   Indeed, Belnick's introduction of its knock-offs in 2012 was timed to capitalize on this "Mad Men effect" (which brought renewed

attention to Mid-Century Modern designs, in particular the Eames chairs) by introducing cheap infringing copies into the market on the heels of a recession.

Herman Miller owns U.S. Trademark Registration No. 3,105,591 for the Eames Aluminum Group chair frame with armrests. (Ciardullo Decl. Ex.[2] 1.)  That Registration has incontestable status, and is recognizes Herman Miller's exclusive right to sell any chair with this underlying frame, regardless of upholstery.   (*See* Incontestability Declarations, Ciardullo Decl. Ex. 2); 15 U.S.C. §§ 1057(b), and 1115.   Thus, the secondary meaning of the Registration cannot be challenged except by proof that Herman Miller *abandoned* its design to an overwhelming number of infringers that erased the brand.  (*See* Section II, *supra*.)

Herman Miller also claims unregistered trade dress rights in upholstered versions of the Thin Pad and Soft Pad versions of the Eames Aluminum Group chairs.  (Dkt. 42, ¶¶ 23-33, 39-44, 95-106.)  However, those that have the same frame as shown in the registration necessarily enjoy the same presumption of secondary meaning (as adding something to a registered non-function design logically cannot transform it into a functional one).  And the frames of the others that are not identical are very similar.  As to any unregistered rights (essentially upholstery using a frame other than what was registered), Herman Miller's evidence of fame and extensive use of the trade dress

---

[2] "Ex." refers to exhibits to the accompanying Declaration of Jean-Paul Ciardullo.

strongly support secondary meaning. *See Robarb,* 1991 U.S. Dist. LEXIS 22086, at \*10-11 ("Robarb has tendered sufficient evidence to show secondary meaning in the Robarb Trade Dress, including continuous and prominent use since Robarb's invention of the product, high sales volume, widespread advertising in trade shows, trade journals, and other situations focusing on the Robarb Trade Dress, high expenditures for such advertising and clear customer recognition."); *Callaway*, 915 F. Supp. at 1213 (finding that Callaway's popularity and high sales help establish secondary meaning).

Herman Miller has an expansive enforcement program to combat infringers, which includes conducting internet takedowns, sending cease and desist letters, and filing lawsuits.  (Casey Bond Decl., ¶ 12.)  Most notably, Herman Miller just sued one of Belnick's suppliers – Blumenthal Distributing – for selling the *exact same style of knock-offs*.  Not only did the jury find that all of Herman Miller's asserted trade dress had secondary meaning, but it also found the design to be legally famous, and awarded almost three times Blumenthal's infringing profits to Herman Miller for infringement and dilution.  (*See* Final Judgment & Injunction at Ciardullo Decl. Ex. 3.)

## IV.    BELNICK'S PURPORTED EVIDENCE OF THIRD PARTY COPYING SHOULD BE EXCLUDED

### A.    An Overview Of Why Belnick's Materials Are Not Probative

Belnick has argued that third party infringement undermines secondary meaning of the Eames Aluminum Group designs.  However, as discussed in Section II, a brand

owner need not prove the absence of infringers to maintain trade dress rights, and the presence of copyists itself confirms the popularity of the brand. Thus, the nominal existence of third party infringers *supports* secondary meaning, and thus yields the opposite of the conclusion Belnick wishes to draw.

Indeed, Herman Miller does not contest the nominal fact that infringers have existed, and still do exist. Herman Miller recently successfully concluded a lawsuit against one of Belnick's suppliers, Blumenthal Distributing, which was selling the exact same types of infringing chairs as Belnick. Herman Miller has otherwise also identified to Belnick in discovery many infringers that Herman Miller has stopped via litigation and cease and desist practice over the years. Herman Miller has also explained that it continues an expansive enforcement program.

What is specifically at issue in the present Motion is Belnick's attempt to rely upon a particular limited collection of URLs and website printouts that it gathered in an attempt to prove an untenable argument: that Herman Miller has somehow abandoned the Eames Aluminum Group brand to an overwhelming onslaught of infringers that has entirely destroyed the brand identity and rendered the design unrecognizable to consumers. (*See, e.g.,* Belnick Initial Disclosures, p. 3 (Ciardullo Decl. Ex. 4): "As a result of widespread, unaddressed third-party use over the span of several decades, Belnick contends that

Herman Miller has lost any protectable trade dress in its Eames Aluminum Group and Soft Pad chairs that it might have had.").[3]

However, to prove up such an argument (which is incorrect anyway), Belnick would have needed something it conspicuously was unable to assemble: **data**. Specifically, Belnick would necessarily have needed to try to prove up (1) that the number of third party infringing unit sales in the United States (the relevant market[4]) was very high, (2) that they had been happening over a long period of time, and (3) that they had been happening in Herman Miller's sales channels such that they "erased" Herman Miller's Eames Aluminum Group brand in the eyes of relevant consumers. *See* cases cited in Section II, *supra*.

Belnick has no such evidence: it just has a few URLs of and website printouts showing copies offered for sale with no proof that the third parties who display chairs there *have even actually sold any at all*, much less in such staggering quantities over such a long time as to wipe out Herman Miller's Eames brand. Nor has Belnick attempted to

---

[3] Belnick has tacitly conceded that the Eames Aluminum Group had secondary meaning coming into the 21st Century, and Belnick certainly points to no evidence to the contrary. (*See* Expert Report of Matthew Mallouk (Ciardullo Decl. Ex. 5), p.1, explaining that the purported copying of the Eames chairs began in the "mid-2000s.")

[4] *See, e.g., Asics Corp. v. Skechers U.S.A.*, No. 07-0103, 2007 U.S. Dist. LEXIS 38048, at *25 (C.D. Cal. Apr. 25, 2007) (sales must be parsed out into U.S. versus foreign to establish secondary meaning of U.S. trade dress rights).

show for how long any of these merchants have been active or that any such website has ever enjoyed more than modest internet traffic – or even that these few internet resellers rely on more than one or two manufacturing sources.  Beyond which, Belnick's own corporate witness has readily conceded that Belnick's position is based on pure speculation.

Without any information or analysis regarding the quantity of non-party chairs sold, the period of time they were sold, the manufacturing source, and the relevant marketplace, it is impossible for a trier of fact to assess any supposed impact of such possible copies on the strength of Herman Miller's trade dress rights, much less that they completely overwhelmed Herman Miller's brand.  *See* cases cited in Section II, *supra; see also FN Herstal v. Clyde Armory, Inc*., 123 F. Supp. 3d 1356, 1375 (M.D. Ga. 2015) ("While other manufacturers submitted SCAR prototypes to the SOCOM program, there is no evidence showing these manufacturers used the SCAR mark to sell firearms products, let alone the nature and extent of that use.  Thus, the Court finds that all four factors weigh in favor of finding that FN's SCAR mark had acquired distinctiveness"); *Playboy Enters. v. Netscape Communs. Corp*., 354 F.3d 1020, 1027 n.33 (9th Cir. 2004) (denying defendant's requested relief where there was no competent evidence of degree of third party market overlap).

13

Even assuming some of the chairs cited by Belnick were sold in the relevant US market channels, if they were only sold as of shortly before Belnick's searches were performed, then they could not have had any meaningful effect on Herman Miller's trade dress rights, which have been maturing for decades. *Robarb*, 1991 U.S. Dist. LEXIS 22086, at *8 ("Third-party usage occurring relatively recently, well after the [] Trade Dress was first put on the market, is entitled to little or no probative value, particularly when the extent of the use has not been shown."). The chairs might also have been sold only briefly and then discontinued, as may very well be the case for the URLs Belnick identified that are now inactive.

For ease of reference, the particular URLs and website printouts that are currently at issue in this Motion can be broken out into three categories:

> **Category 1:** URLs that it listed in its Initial Disclosures and in response to Herman Miller's Interrogatories
>
> **Category 2:** Website printouts that it produced for the first time at the November 25, 2019 deposition of Herman Miller's Rule 30(b)(6) witness, and
>
> **Category 3:** URLs that it identified for the first time in the January 17, 2020 rebuttal report of purported expert Matthew Mallouk.

As discussed below, in addition to the substantive defects of Belnick's foregoing proffered "evidence," Herman Miller argues that Categories 2 and 3 should

14

independently be precluded on procedural grounds, and in view of *Daubert* with respect to Mr. Mallouk.

**B.   Belnick's Written Discovery Responses (Category 1) Do Not Support The Relevance Of Any Purported Third Party Infringers**

Pursuant to Local Rule 84.1(B), Belnick was obliged to articulate in its Initial Disclosures "a detailed factual basis" for its defenses.  In its Initial Disclosures that were served on March 29, 2019 (and never amended), Belnick presented the conclusory attorney argument that:

> it is well-established that extensive third-party use combined with failure to police against such third-party use will defeat even those product configuration claims where secondary meaning may be shown.  There is widespread use of similar designs in the marketplace. … As a result of widespread, unaddressed third-party use over the span of several decades, Belnick contends that Herman Miller has lost any protectable trade dress in its Eames Aluminum Group and Soft Pad chairs that it might have had.

Belnick then identified nine URLs for websites on which third parties purportedly sold infringing chairs.  (Ciardullo Decl. Ex. 4, Initial Disclosures at pp. 2-3.)

Following up on this, Herman Miller's April 12, 2019 Interrogatory No. 2 asked Belnick to "STATE IN DETAIL all facts upon which you base any challenges to the validity of Herman Miller's asserted trade dress rights."  (Ciardullo Decl. Ex. 6, Belnick 7/26/19 Responses to Interrogatories.)  Here, Belnick repeated its same comments from the Initial Disclosures, and identified six URLs.  (*Id*.)  Separately, Herman Miller's

Interrogatory No. 14 pointedly asked Belnick to "Identify any product designs by a non-party to this lawsuit that are sold in the United States that Belnick contends are relevant to the level of recognition or fame of Herman Miller's asserted product designs."   In response to this, Belnick did not answer, but rather said that it would identify documents pursuant to Fed. R. Civ. P. 33(d).   (*Id.*)   However, Belnick never did so, and never amended the response.   (Ciardullo Declaration, ¶ 7.)

The conclusory and unsupported arguments presented in Belnick's written discovery are inadmissible.  *See Goodin v. Geren,* Civil Action No. 1:06-CV-646-BBM, 2007 U.S. Dist. LEXIS 105423 (N.D. Ga. Dec. 28, 2007) ("The evidence cannot consist of conclusory allegations or legal conclusions." (internal quotations omitted)); *Bagwell v. Peachtree Doors & Windows, Inc.*, No. 2:08-CV-191-RWS-SSC, 2011 U.S. Dist. LEXIS 42262, at *34 (N.D. Ga. Feb. 8, 2011).  The only purported "evidence" that Belnick offers is a listing of a handful of URLs of purported third party infringers with no evidence of any actual sales or manufacturing sources.   Herman Miller does not dispute that there are infringers other than Belnick, but because Belnick has no actual *data*, its "evidence" is meaningless.  *See Breakers of Palm Beach, Inc. v. Int'l Beach Hotel Dev.,* 824 F. Supp. 1576, 1584 (S.D. Fla. 1993) ("Defendant has only pointed out that these uses exist, but has not demonstrated that they have any impact on the public's

perception regarding the strength of Plaintiff's mark."); *see also* balance of cases cited in Section II, *supra.*

Worse than that, the selection of URLs itself is unreliable.  Remarkably, Belnick includes its own supplier "Office Star" as one of the purported third party infringers, but "Office Star" is the brand owned by Blumenthal Distributing that Herman Miller prevailed against in a 2016 trial concerning the exact same style of infringing Eames chairs.  They have been under an injunction since 2016, and have been complying with it.  (Final Judgment & Injunction at Ciardullo Decl. Ex. 3.)

As to the rest, several of the websites are no longer even active.  (Declaration of Casey Bond, ¶ 10.)  And as to the balance, Herman Miller is investigating, *i.e.*, it cannot be said that Herman Miller condones any copying.  (*Id.*, ¶ 10.)  Herman Miller – just like Rolex – cannot sue all infringers at once (nor is it required to), and some matters can be readily resolved without litigation.  *Breakers of Palm Beach,* 824 F. Supp. at 1584 ("Plaintiff is not obligated to litigate against each and every potential infringer.").  The point is that the mere fact that these websites can be viewed online does not provide any useable evidence to support the sweeping conclusions Belnick wishes the fact-finder to draw from them.  (*See* Section II, *supra.*)

17

**C.** **Belnick's Website Compilation Exhibit (Category 2) Is Riddled With Inaccuracies And Is Not Probative**

On November 25, 2019 (shortly before the December 12, 2019 close of fact discovery), during the deposition of Herman Miller's Rule 30(b)(6) witness Casey Bond, Belnick presented for the first time a collection of website printouts purporting to show third parties selling infringing copies of Eames chairs.

As a preliminary matter, these documents should be excluded because the third parties they identify were never identified by Belnick in any of its written discovery responses, which were never amended. *See* Fed. R. Civ. P. 37(c)(1); *Goodman-Gable-Gould Co. v. Tiara Condo. Ass'n*, 595 F.3d 1203, 1207-08 (11th Cir. 2010) (excluding evidence that had not been disclosed in response to discovery requests). Instead, because they were produced right at the close of discovery before Thanksgiving, Herman Miller necessarily did not have time to conduct any further discovery about them.

But beyond that, the website compilation is riddled with so many defects as to render it entirely unreliable as evidence. Most glaringly, many of the websites appear on their face to be **overseas companies**, and indicate that they do not ship products to the United States. (Declaration of Casey Bond, ¶ 9, identifying 22 websites that appear foreign; *see also* the websites themselves.) For example, Matt Blatt is an Australian company whose shipping information FAQ webpage indicates that it only ships in Australia. (www.mattblatt.com.au/faq#Delivery.) Likewise, Furny.com is an EU

18

company that displays pricing in Euros and appears to only ship inside the EU.  Herman Miller will not walk through here each of these 22 foreign websites: as the party proffering the evidence, Belnick bears the burden of establishing relevance.  Foreign third parties selling products outside the United States have no bearing on any issue in this case, which concerns solely United States intellectual property rights, and consumer perceptions in the United States.

As to the United States company websites, Herman Miller is actively investigating any possible issues of infringement, undermining Belnick's intended factual conclusion that Herman Miller somehow allows copying to occur.  (See discussion above in Section IV.B.)  The bare existence of some infringers does not affect Herman Miller's claim of secondary meaning.  (*See* Section II.)  Without any actual data about these websites and what they purport to sell, the mere fact that a website exists does not support Belnick's conclusions.

D.    **Belnick's Corporate Witness Confirms Belnick's Lack Of Knowledge**

During his deposition, Belnick's Rule 30(b)(6) witness Sean Belnick conceded on behalf of the company that Belnick completely lacks any legitimate evidence about third party infringing sales beyond conclusory and speculative references to websites (Belnick Tr. (Ciardullo Decl. Ex. 7) at 132:18-134:24):

19





Belnick has thus overtly conceded a lack of useable evidence concerning any third

party resellers of infringing product.

E.   **The Mallouk Report (Category 3) Lacks Any Usable Evidence, And Is Otherwise Procedurally Improper And Excludable**

　　1.　**Mr. Mallouk's Unsupported Conclusory Statements Are Inadmissible**

Evidently appreciating that it had very little support to make any arguments concerning third party infringement, Belnick improperly attempted to shoehorn additional fact discovery into the purported rebuttal expert report of Matthew Mallouk, who is one of Belnick's own former chief executives.  In his report, Mr. Mallouk lists an additional handful of URLs for websites that he claims sell knock-offs of the Eames chairs, and avers in conclusory fashion that "a very large number of chairs that are replicas of, or may look similar to, the Eames Aluminum Group and Eames Soft Pad chairs [] have since the mid-2000s been sold by multiple outlets." (Mallouk Report p. 1, attached at Ciardullo Decl. Ex. 5.)  Mr. Mallouk's report offers no actual evidence to support his claim, and does not even attempt to quantify what "very large number" means.  His testimony simply echoes the same empty attorney argument found in Belnick's initial disclosures, yet what most stands out is his inability to back up such naked advocacy with any real data.  Mr. Mallouk's commentary is facially speculative and inadmissible, and Herman Miller has separately moved to exclude his purported expert testimony.

22

### 2. Belnick Cannot Use Mr. Mallouk To Introduce New "Evidence" That It Failed To Provide In Fact Discovery

Mr. Mallouk's report was served on January 17, 2020, over a month after the December 12, 2019 close of fact discovery (Ciardullo Decl. Ex. 5), and is not a procedurally permissible method to introduce new evidence. In fact, as further discussed in Herman Miller's concurrent Motion to Exclude Mallouk's testimony, his rebuttal report is not even proper rebuttal, since it does not actually contradict any conclusions of Herman Miller's experts.

Pursuant to Fed. R. Civ. P. 37, all new "evidence" concerning third party infringement introduced by Mr. Mallouk should be excluded as untimely. *See, e.g., ChemFree Corp. v. J. Walter, Inc.*, No. 1:04-CV-3711-JTC, 2009 U.S. Dist. LEXIS 131044, at *3 (N.D. Ga. May 26, 2009) (granting motion in limine to exclude any documents or testimony that were not previously disclosed in response to interrogatories). This is not just a procedural technicality. If Belnick had identified the purported evidence in response to Herman Miller's April 2019 Interrogatories and Requests for Production – responses to which were due in May 2019 – Herman Miller might have used the discovery period to investigate. By providing new "evidence" in a rebuttal expert report a month after the close of fact discovery, Belnick not only shirked discovery obligations, but ensured that Herman Miller was hobbled in responding.

23

**F.**     **Belnick's Sparse And Conclusory Non-Evidence Is Irrelevant And Highly Prejudicial**

As discussed above, the nominal existence of a number of third party infringers does not support any cognizable legal argument Belnick intends to make, and in fact tends only to support Herman Miller's position on secondary meaning.  While Herman Miller does not dispute the nominal existence of third party infringers (indeed, it has shut down countless of them), the bare fact that other infringers exist is not what Belnick is trying to prove: rather, Belnick intends its URL/website materials to affirmatively prove that third party infringers have historically sold in overwhelming quantity over such a long time in the United States as to erase the Eames brand in the minds of relevant consumers.  The URL/website materials are incompetent to support any such assertion, and are therefore simply irrelevant under F.R.E. 401 and 402.

Even if there were some scintilla of relevancy to Belnick's materials, that relevance is vastly outweighed by the risk of undue prejudice from juror confusion, and hence the material should be excluded under F.R.E. 403.  Belnick will unjustifiably strive to make the jury believe that each of the websites it identifies (1) must have actually sold what it advertises, (2) must have sold in large quantities, (3) must have been selling for a long time, (4) must have sold in the United States, (5) and must have had such a profound effect on the marketplace as to undo Herman Miller's intellectual property rights.  *None of these conclusions is supported by any evidence*.  However, if Belnick is permitted to

24

march through a large number of website printouts in front of the jury – which could be orchestrated to eat up a significant amount of courtroom time at trial – it might succeed in significantly confusing the jury, and causing severe prejudice to Herman Miller.

V.    **CONCLUSION**

For the foregoing reasons, Belnick should be precluded from introducing evidence or argument concerning alleged non-party copying of Herman Miller designs.   A Proposed Order is submitted herewith.

Dated:  March 2, 2020                    Respectfully submitted,

*s/ Jean-Paul Ciardullo*
Jean-Paul Ciardullo (admitted *pro hac*)
email:  jciardullo@foley.com
**FOLEY & LARDNER LLP**
555 South Flower Street, Suite 3500
Los Angeles, CA 90071-2411
Phone: 213.972.4500
Facsimile: 213.486.0065

Jonathan E. Moskin (admitted *pro hac*)
email:  jmoskin@foley.com
**FOLEY & LARDNER LLP**
90 Park Avenue
New York, NY 10016-1314
Phone: 212-682-7474
Facsimile: 212-687-2329

Amanda G. Hyland
email:  ahyland@taylorenglish.com
Georgia Bar No. 325115
**TAYLOR ENGLISH DUMA LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339

Attorneys for Plaintiff
HERMAN MILLER, INC.

## <u>APPENDIX A</u>
## EXAMPLES OF GENUINE EAMES ALUMINUM GROUP CHAIRS

